UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ANGELO D. JOHNSON,

                Plaintiff,

        v.                              9:20-CV-0622 (LEK/ATB)

C. MILLER, *et al.*,

                Defendants.

## DECISION AND ORDER

## I.    INTRODUCTION

      The Clerk has sent to the Court for review a complaint submitted by pro se plaintiff Angelo D. Johnson raising claims pursuant to 42 U.S.C. § 1983. Dkt. No. 2 ("Complaint").[1] Plaintiff, who is incarcerated at Five Points Correctional Facility ("Five Points C.F."), has not paid the filing fee for this action.

      Plaintiff asserts claims against the following defendants: Great Meadow Correctional Facility ("Great Meadow C.F.") Superintendent C. Miller; Great Meadow C.F. First Deputy Superintendent Mrs. McIntosh; Great Meadow C.F. Deputy Superintendent G. Caron; Great Meadow C.F. Assistant Deputy Superintendent M. Collins; Great Meadow C.F. Lieutenant G. Murphy; Great Meadow C.F. Sergeant Gilles; Great Meadow C.F. Correction Officer P. Boule; Great Meadow C.F. Correction Officer Rich; Great Meadow C.F. Correction Officer Papa;

---

[1]  This action was originally commenced in the Southern District of New York. By Order filed May 14, 2020, the Honorable Colleen McMahon of the Southern District of New York granted Plaintiff's application to proceed in forma pauperis. Dkt. No. 4. By Order filed June 3, 2020, the Honorable Kenneth M. Karas of the Southern District of New York severed and transferred Plaintiff's claims arising out of his incarceration at Great Meadow Correctional Facility and Five Points Correctional Facility to the Northern District of New York. Dkt. No. 6.

Great Meadow C.F. Correction Officer John Doe #1; Great Meadow C.F. Correction Officer

John Doe #2; Great Meadow C.F. Correction Officer Jane Doe #3; New York State Department

of Corrections and Community Supervision ("DOCCS") Dr. Goe; DOCCS Dr. Karandy;

DOCCS Physician Assistant Nesmith; DOCCS Nurse Rocque; DOCCS Nurse Christy; DOCCS

Dr. John Morley; DOCCS Regional Health Administrator Mary Tandy-Walters; DOCCS Nurse

J. Perez; DOCCS Nurse Jane Doe; and Five Points C.F. Superintendent Tomas (collectively,

"Defendants"). Id. at 1, 3–9.

## II.    SUFFICIENCY OF THE COMPLAINT

### A. Governing Legal Standard

Under 28 U.S.C. § 1915, when a plaintiff seeks to proceed in forma pauperis, ". . . the

court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is

frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks

monetary relief against a defendant who is immune from such relief." § 1915(e)(2)(B).[2] Thus,

even if a plaintiff meets the financial criteria to commence an action in forma pauperis, it is the

court's responsibility to determine whether the plaintiff may properly maintain the complaint

before the court permits the plaintiff to proceed with an action in forma pauperis. See id.

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil

action in which a prisoner seeks redress from a governmental entity or officer or employee of a

governmental entity" and must "identify cognizable claims or dismiss the complaint, or any

portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim

---

[2]  To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." See Neitzke v. Williams, 490 U.S. 319, 325 (1989).

upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune from such relief." § 1915A; <u>see also</u> <u>Carr v. Dvorin</u>, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (stating that § 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); <u>Abbas v. Dixon</u>, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both §§ 1915 and 1915A are available to evaluate prisoner pro se complaints).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Twombly</u>, 550 U.S. at 556). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." <u>Id.</u> "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" <u>Id.</u> at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. <u>Id.</u> (internal quotation marks and alterations omitted).

In reviewing a pro se complaint, the court has a duty to show liberality toward pro se litigants, see Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution . . . in ordering sua sponte dismissal of a pro se complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond," Anderson v. Coughlin, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted) (emphasis in original).

**B.  Summary of the Complaint**

Plaintiff alleges that wrongdoing occurred while he was in DOCCS custody, including while he was incarcerated at Great Meadow C.F. and Five Points C.F. See generally Compl. The following facts arising out of Plaintiff's incarceration at these facilities are alleged in Plaintiff's Complaint.[3]

*1.  Plaintiff's Medical Conditions*

Plaintiff suffers from a number of medical conditions, including "chronic type 1 and 2 acute migraines," chronic sinus infections, high blood pressure, glaucoma, a corneal defect, rheumatoid arthritis, a severe tear in his shoulder, two pinched and severed nerves in his lower neck and back, tears in his right meniscus, depression, post-traumatic stress disorder, personality disorder, hepatitis C, and seizures. Compl. at 10–11. At unidentified times, Plaintiff has been diagnosed with depression, anxiety, post-traumatic stress disorder, and personality disorder. Id. at 10. Plaintiff has attempted suicide on at least four occasions and was placed in a mental health hospital for 30 days in 2006 after one such attempt. Id.

_____

[3]  Page numbers cited herein refer to those generated by the Court's electronic filing system ("ECF").

### 2. *Medical Care at Great Meadow C.F.*

Plaintiff was transferred to Great Meadow C.F. on October 29, 2018. Compl. at 15–16.

Upon arriving at Great Meadow C.F., Plaintiff was seen by Defendant Rocque for an "initial

medical assessment." Id. at 15. Rocque "wantonly stripped . . . plaintiff of all his prior

necessary . . . medication that was [prescribed by] a physician," including pain medication for

pinched nerves and medication for migraine headaches, despite "knowing that such actions

would subject . . . plaintiff to severe pain." Id. at 16. The discontinuation of Plaintiff's

medications disregarded "prior recommendations" by specialists. Id. As a result, Plaintiff was

in "severe pain" following his arrival at Great Meadow C.F. Id.

On November 1, 2018, Plaintiff was seen by Goe. Id. at 16. During the visit, Plaintiff

attempted to explain his medical concerns and "serious chronic issues[,]" but Goe "maliciously

. . . stated" that Plaintiff has "to[o] many issues" and, "despite . . . seeing plaintiff in severe pain

and witnessing [his] serious incapacitated condition of limited mobility[,]" failed to order

Plaintiff migraine or pain medication. Id. at 16–18.

On or about November 16, 2018, Plaintiff was seen by Nesmith. Id. at 17. Nesmith

"maliciously and sadistically refused to hear" about Plaintiff's medical conditions and concerns

and instead advised Plaintiff that he has to choose "one issue" that he thinks deserves serious

attention. Id. Plaintiff then "attempted to voice[] his concern" about his migraine medication,

but Nesmith cut him off "mid-sentence." Id. at 17–18. Following the visit, Plaintiff remained

without his previously prescribed medication. Id. at 18.

On or about November 21, 2018, Plaintiff was again seen by Nesmith, who "repeated

the same behavior and reckless conduct" by "not rendering . . . needed . . . medical care and treatment[,]" despite witnessing Plaintiff in "severe" pain and listening to Plaintiff attempt to "speak[] about his medical . . . issues[.]" Id. at 18.

Plaintiff filed administrative complaints regarding the medical treatment he received in November 2018, including a complaint with the DOCCS Chief Medical Officer, Morley, on November 20, 2018. Id. at 18. Plaintiff also filed a grievance on November 25, 2018, regarding Goe's inadequate medical treatment. Id.

On or about December 5, 2018, Plaintiff was seen by Karandy. Id. at 19. During the appointment, Karandy "went over all [of] plaintiff's serious chronic medical issues" and "admitted" that he did not "understand" why Plaintiff's migraine medication was discontinued. Id. Karandy also told Plaintiff that he would "immediately . . . get [Plaintiff] needed treatment" for his pinched nerves. Id. at 20.

Karandy, however, only ordered a "partial" month supply of Plaintiff's migraine medication, which was not sufficient to treat Plaintiff's medical needs. Id. at 19. In addition, Karandy failed to order pain medication for Plaintiff's pinched nerves and other physical ailments. Id. at 20.

Later that month, Plaintiff filed three sick call slips "for issues of pinch[ed] nerves and right knee [pain]" in which he detailed "how [his] conditions [were] causing severe pain and agony[.]" Id.

On December 14, 2018, Plaintiff "received a detailed response[] letter from defendant [Regional Health Services Administrator] Mary Tandy-Walters . . . that showed full awareness of plaintiff's situation but deliberately and maliciously failed to remedy plaintiff's underlying

conditions[.]" Id. at 23.[4]

On January 11 and January 16, 2019, Plaintiff filed "formal complaint letters" with Miller and DOCCS Commissioner Anthony Annucci, regarding inadequate medical treatment related to his pinched nerves, right knee complications, and "eyecare[.]" Id. at 20. On February 5, 2019, Plaintiff received "a detailed response[] letter" from Morley, who "allowed plaintiff's providers to recklessly and maliciously delay[] and . . . withhold[] necessary adequate pain medications [and] depriv[e] [Plaintiff of] needed [physical] therapy[,]" despite knowing about Plaintiff's "serious medical needs." Id. at 24–25.

Sometime in January or February 2019, Plaintiff attended his first session with a physical therapist. Id. at 21. The physical therapist advised Plaintiff that he had "placed orders of physical therapy" beginning in early December 2018. Id. However, as a result of Goe and Karandy's failure to follow up on these orders, Plaintiff's physical therapy was delayed. Id.

During Plaintiff's second physical therapy session, which occurred sometime in January or February 2019, the physical therapist advised Plaintiff that he "has a serious condition[,]" explained that his "limited mobility is due to the lack[] of treatment and care[,]" and advised that his "severe pain" could only be "eas[ed] by meds and continual adequate therapy[.]" Id. at

---

[4] Plaintiff also alleges that on January 15, 2020, he received a response from the Central Office Review Committee ("CORC") regarding one of his grievances, which indicated that the Division of Health Services had conducted an investigation into Plaintiff's concerns about his medical treatment and found that he was receiving appropriate medical care and had been properly weaned off Neurontin, the pain medication prescribed to Plaintiff before his transfer to Great Meadow C.F. Compl. at 24. Plaintiff further alleges that CORC's statements are false because Tandy-Walters knew—on an unidentified date before January 15, 2020—that he was not receiving treatment for his right knee, medication for his migraine headaches, or adequate eyecare, and was not weaned off Neurontin, but was instead taken off that medication "cold turkey[.]" Id.

21–22.

On or about February 14, 2019, Plaintiff was seen by Goe, who once again denied Plaintiff pain medication for his pinched nerves and right knee, despite witnessing Plaintiff in "a serious chronic painful state[.]" Id. at 22.

On or about February 25, 2019, Plaintiff was transported to Coxsackie Correctional Facility to see an orthopedic specialist regarding his right knee. Id. at 23. The specialist ordered an MRI, but no pain medication or physical therapy. Id.

On or about March 29, 2019, Plaintiff submitted a letter to Karandy regarding inadequate medical care he was receiving for his right knee and pain associated with his pinched nerves. Id. at 25. On or about May 17, 2019, Plaintiff was seen by Goe, who continued to deny him "adequate pain medications" and "treatment" for his "chronic medical conditions[,]" despite again witnessing Plaintiff "in a state of excruciating pain[.]" Id.

In June and July 2019, Plaintiff continued to submit sick call slips for "ongoing severe pain to [his] right knee and two pinch[ed] nerves." Id. at 26. In September 2019, Plaintiff submitted three more sick call slips for "ongoing severe pain that is . . . causing great agony mentally." Id.

In October or November 2019, Plaintiff was seen by an orthopedic specialist at Coxsackie Correctional Facility. Id. at 26. During the appointment, Plaintiff received a cortisone shot in his right knee. Id. The specialist told Plaintiff that the shot was typically "only good for 3 to 6 months[,]" and sometimes less, and that he should therefore "let [his] provider know when the pain becomes very severe again[] so [he] can receive another shot." Id. The specialist also advised Plaintiff that he had "put in many follow-ups" for further evaluation after

8

Plaintiff had received an MRI. Id.

### 3. Use-of-Force Incident at Great Meadow C.F. and Subsequent Restrictive Confinement

On or about June 17, 2019, while in the recreation yard, Plaintiff became dizzy and passed out. Compl. at 28. When Plaintiff regained consciousness, he was en route to the medical department. Id. Upon arriving at the infirmary, Gilles, Boule, Rich, Papa, Doe #1, Doe #2, and Doe #3 threw Plaintiff on the infirmary table. Id. Gilles then "aggressively question[ed]" Plaintiff and accused him of being "high on K2," a synthetic cannabinoid Id. Plaintiff "respectfully denied" the accusation and attempted to compose himself to avoid having a seizure. Id. at 29.

While Plaintiff's hands and feet were in restraints, Nesmith put a "very harmful concoction on his gloved hands and viciously cover[ed] [Plaintiff's] mouth and nose" while applying pressure. Id. at 29. Simultaneously, Gilles ordered his subordinates to "hold plaintiff's arms and legs down[.]" Id. The substance that Nesmith placed on Plaintiff's mouth caused him "extreme pain[.]" Id.

After Plaintiff was unsuccessful in his effort to struggle out of the hold, Nesmith "stopped and let up, while laughing[.]" Id. at 30. "Plaintiff immediately start[ed] yelling[,] . . . 'they are trying to kill me back here.'" Id. In response, Gilles ordered "the C.O. defendants . . . to tighten up the handcuffs[,]" which "caused [Plaintiff's] circulation to be cut[] of[f] and extreme pain to [his] hands." Id. Nesmith then "again tried to viciously suff[o]cate . . . plaintiff" with the "harmful concoction on his hands." Id.

Eventually, Nesmith removed his hands from Plaintiff's face. Id. at 30. Gilles then

ordered the correction officers in the room to lift Plaintiff up and bring him to the second floor of the medical department. Id. at 30. While en route to the second floor, Plaintiff's wrists remained tightly handcuffed and his arms were "maliciously extended backwards[,]" which caused him "excruciating pain." Id. at 31.

Upon arriving at the second floor, Plaintiff was taken to an observation room, and Gilles ordered the other escorting officers to remove Plaintiff's restraints. Id. at 31. After the restraints were removed, Gilles ordered Plaintiff to strip. Id. Plaintiff removed all of his clothes except his underwear then asked Gilles if he would remove all the other officers from the room. Id. Gilles "grew indignant" and ordered the correction officers in the room to assault Plaintiff, which they did. Id.

Following the assault, Plaintiff was placed back in restraints and forced onto a mattress, face down. Id. at 32. One of the officers then removed Plaintiff's underwear and Plaintiff was held in a compromised position while Gilles conducted a body cavity search. Id. Thereafter, the officials in the room took turns mocking Plaintiff while he remained naked on the mattress. Id. at 32–33. Plaintiff's handcuffs were then tightened at the direction of Gilles, and the officials left the room. Id. at 33.

The next day, Plaintiff was cleared by a medical professional and returned to his cell block, but "unlawfully" placed on "punitive Adseg. keeplock[.]" Id. at 35.

On or about June 23, 2019, Plaintiff attended a disciplinary hearing before Correction Lieutenant Murphy. Id. at 35. Before the hearing began, Murphy encouraged Plaintiff to plead guilty in exchange for a sentence of 60 days of keeplock confinement and advised Plaintiff that, if he did not plead guilty, he would be found guilty and sentenced to more than 60 days of

confinement in the special housing unit ("SHU"). Id. Plaintiff refused to plead guilty, and Murphy responded, "have it your way[.]" Id.

Murphy began the hearing by reading Plaintiff's "alleged misbehavior report charges to . . . [him]." Id. at 35. Plaintiff objected because he had not been served with a misbehavior report or provided assistance preparing for the hearing. Id. at 35–36. Plaintiff then identified on the record the witnesses he desired to call and cross-examine. Id. at 36. Murphy adjourned the hearing in light of Plaintiff's objection. Id.

On or about July 1, 2019, Plaintiff was brought back to the "hearing room" with Murphy, and the disciplinary hearing resumed. Id. at 36. At some point after the hearing commenced, Murphy ordered an unidentified correction official to escort Plaintiff back to his cell. Id. Plaintiff was removed from the hearing room before he was able to call any witnesses or cross-examine adverse witnesses. Id. Thereafter, Murphy falsely represented on the record that Plaintiff did not want to participate in the hearing. Id. at 37.

On or about July 9, 2019, Gilles and another unidentified official escorted Plaintiff from his cell to SHU "per his Tier 3 hearing outcome." Id. Plaintiff never received a copy of Murphy's written disciplinary disposition. Id.

After Plaintiff arrived at SHU, he was seen by Rocque and "asked medical questions[.]" Id. at 38. Plaintiff informed Rocque that he did not have any of his "carry on meds for his seizures, high blood pres[s]ure, chronic . . . migrains [sic], chronic sinus [issues], [or] glaucoma," and also did not have a contact case or contact solution. Id. Rocque advised Plaintiff that he would receive his medication later in the day. Id.

Plaintiff's SHU cell was "extremely unduly hot" and had no ventilation. Id. at 38. As a

result of the "extreme heat, inadequate ventilation, and . . . cigaret[te] smoke that . . . flooded plaintiff's cell[,]" he experienced a "serious acute migrain[e]" and "became dizzy." Id. at 39. The next day, Plaintiff suffered a seizure. Id.

Following the seizure, Plaintiff was taken to the medical department at Great Meadow C.F., where Gilles ordered unidentified officials to hold his arms and legs down while Nesmith and Christy "prepare[d] something." Id. at 39. While Plaintiff was held down and in restraints, Nesmith again covered his mouth and nose with "that very very harmful concoction on his hands[,]" which caused Plaintiff's lips to burn "severely." Id.

After "a while," Nesmith stopped covering Plaintiff's mouth. Id. at 39. Christy then "proceeded to do the same" while Gilles repeatedly referred to Plaintiff, an African-American man, as a "monkey." Id.

The next day, Plaintiff was discharged from the medical facility without any treatment for the injury to his lips. Id. at 41. The burn on Plaintiff's lips caused him severe pain for three days, hindering his ability to eat and drink during this time. Id.

Plaintiff was kept in SHU under "inhuman living conditions[,]" forced to shower in "dirty . . . stalls" and fed "insufficient food" from "dirty trays[.]" Id. at 41–42. Plaintiff repeatedly complained about the conditions of his confinement to Miller, McIntosh, Collins, and Caron when these officials made their weekly rounds within SHU. Id. at 42. Plaintiff also complained to these officials about his visibly "agonizing state" from the assaults against him, and "inadequate medical treatment" for his physical ailments, yet they failed to remedy "the daily constitutional violations." Id.

On July 15, 2019, Plaintiff received a portion of Murphy's written disciplinary

disposition, which indicated that he was sentenced to 75 days of SHU confinement beginning on July 2, 2019, and would lose 120 days of packages, commissary, and telephone privileges. Id. at 42–43. Plaintiff was not credited for the "Adseg confinement" he served between June 17 and July 1, 2019. Id.

Sometime in "late July, 2019," Plaintiff was transported to Coxsackie Correctional Facility, where he was seen by an orthopedic specialist and given a cortisone shot for the "excruciating pain" in his left shoulder that he had experienced daily since June 17, 2019, when he was "brutally assaulted." Id. at 43. Goe and Karandy failed to treat Plaintiff's left shoulder following the assault on June 17, 2019, despite knowing about Plaintiff's medical needs. Id. at 43–44.

Collins and Caron refused to grant Plaintiff "time cuts" provided for in the "reform[ed] SHU laws pass[ed] in 2016." Id. at 43. As a result, Plaintiff served his entire SHU sentence. Id.

### 4.  Transfer to Five Points C.F.

On or about January 16, 2020, Plaintiff was told to pack up his property because he was being transferred. Compl. at 44. After Plaintiff packed "four draft bags" of property, an unidentified official ordered him to carry the bags out of his cell. Id. Plaintiff was unable to do so because of his pinched nerves and right knee condition. Id.

While Plaintiff was "in the draft room being processed [for his] transfer[,]" Correction Sergeant Cook told Plaintiff that based on "all the . . . complaints" he filed against officers, and his refusal to carry his property bags, he should not be surprised if his property did not make it to the next location. Id. at 44. Thereafter, Plaintiff witnessed officials load inmate property bags onto a transport bus and return his property bags back to the facility. Id.

On January 17, 2020, Plaintiff arrived at Auburn Correctional Facility, where he was incarcerated for five days. Id. at 44. Upon his arrival, Plaintiff was told that his pain medications were lost and the medical department could not do anything for him. Id. Plaintiff was denied a shower, access to hot water, toothpaste, and a tooth brush, and was forced to sleep in a cold cell without "sufficient sheets and blankets." Id. at 44–45.

On or about January 21, 2020, Plaintiff was transferred to Five Points C.F. Id. at 45. Upon arriving at Five Points C.F., Plaintiff was placed in SHU, despite having completed his prior disciplinary sentence on January 16, 2020. Id. at 47. Plaintiff was not initially told why he was confined in the SHU. Id. at 48.

Following his arrival at Five Points C.F., Plaintiff was seen by Nurse Jane Doe for "his initial medical intake." Id. at 45. Plaintiff informed her that his medications and contact solution were lost in transit and detailed his medical conditions that require medication and treatment. Id. Nurse Jane Doe declined to provide Plaintiff with contact solution or any medications. Id. at 45–46.

On or about January 27, 2020, Plaintiff received a written disciplinary disposition based on a disciplinary hearing that occurred at Great Meadow C.F. on January 10, 2020. Id. at 48. The disciplinary hearing was conducted by Collins and resulted in a finding of guilt on one or more of the unidentified disciplinary charges and a sentence of 30 days of SHU confinement. Id. Plaintiff was never given an opportunity to attend this hearing, which was conducted without his knowledge or consent. Id.

On February 9, 2020, another disciplinary hearing was held by Collins at Great Meadow C.F., once again in Plaintiff's absence and without his knowledge or consent. Id. at 48. At the

conclusion of the hearing, Collins found Plaintiff guilty of one or more of the unidentified

disciplinary charges and sentenced him to 54 days of SHU confinement. Id.

Between January and March, 2020, Plaintiff was denied medical treatment by Perez,

which Tomas failed to remedy despite witnessing Plaintiff in severe pain. Id. at 9, 46–47.

5. *Plaintiff's Claims Based on Events that Occurred at Great Meadow C.F.*

Liberally construed, the Complaint asserts the following claims based on events that

occurred at Great Meadow C.F. against various defendants in their individual and official

capacities:[5] (1) Eighth Amendment medical indifference claims against Goe, Karandy, Nesmith,

Rocque, Christy, Morley, Tandy-Walters, Gilles, Boule, Rich, Papa, Doe #1, Doe #2, Doe #3,

Miller, McIntosh, Collins, and Caron; (2) Eighth Amendment excessive force and failure-to-

intervene claims against Gilles, Boule, Rich, Papa, Doe #1, Doe #2, Doe #3, Nesmith, and

Christy; (3) an Eighth Amendment sexual abuse claim against Gilles, Boule, Rich, Papa, Doe

#1, Doe #2, and Doe #3; (4) a Fourth Amendment unlawful search claim against Gilles, Boule,

Rich, Papa, Doe #1, Doe #2, and Doe #3; (5) an Eighth Amendment conditions-of-confinement

claim against Miller, McIntosh, Collins, and Caron; (6) Fourteenth Amendment due process

claims against Murphy and Collins; and (7) a Fourteenth Amendment equal protection claim

against Gilles.[6]

---

[5] Because Plaintiff has not named any officials from Auburn Correctional Facility as
defendants, the Court does not construe the complaint to assert any claims based on Plaintiff's
incarceration at that facility. Moreover, because Plaintiff's claims based on events that occurred
during his confinement at Five Points C.F. are severed and transferred to the Western District of
New York, as discussed below, the Court leaves the determination of those claims for the
Western District of New York.

[6] As noted, Plaintiff alleges that Collins and Caron refused to grant him "time cuts"
provided for in the "reform[ed] SHU laws pass[ed] in 2016." Compl. at 43. Although some

Plaintiff seeks injunctive and monetary relief. Compl. at 49–50. For a complete statement of Plaintiff's claims, reference is made to the Complaint.

### C.  Severance and Transfer of Claims Arising at Five Points C.F.

Rule 21 of the Federal Rules of Civil Procedure permits the Court to sever any claim against a party and proceed with that claim separately. Fed. R. Civ. P. 21. In deciding whether to sever a claim, the Court should consider the following:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

Morris v. Northrop Grumman Corp., 37 F. Supp. 2d 556, 580 (E.D.N.Y. 1999). "A claim may be severed based upon lack of a significant relationship between defendants or solely for the purpose of facilitating transfer. Where the administration of justice would be materially advanced by severance and transfer, a court may properly sever the claims against one or more defendants for the purpose of permitting the transfer of the action against other defendants."

Cain v. New York State Bd. of Elections, 630 F. Supp. 221, 225–26 (E.D.N.Y. 1986). "A decision to sever lies within the discretion of the Court." Id. at 225.

_____

courts have recognized a potential Eighth Amendment claim based on alleged excessive SHU confinement, see Peoples v. Annucci, No. 11-CV-2694, 2012 WL 1575302, at *9 (S.D.N.Y. May 2, 2012), neither Collins nor Caron is alleged to have been responsible for the duration of Plaintiff's SHU confinement. Moreover, the Complaint is devoid of any allegations which plausibly suggest that either of these Defendants refused to reduce Plaintiff's SHU confinement period out of deliberate indifference to his health or safety.  For these reasons, the Court does not construe the Complaint to assert an Eighth Amendment claim against either of these officials based on Plaintiff's SHU confinement.

Here, the claims arising out of Plaintiff's incarceration at Five Points C.F. are more appropriately heard in the Western District of New York, where that facility is located. See 28 U.S.C. § 112(d).[7] Those claims are separate and distinct from the claims arising out of Plaintiff's incarceration at Great Meadow C.F. and will require different witnesses and documentary proof. The remainder of the factors do not weigh against severance. Thus, pursuant to Fed. R. Civ. P. 21 and 28 U.S.C. § 1404(a),[8] the claims that arose while Plaintiff was incarcerated at Five Points C.F., in the Western District of New York, along with the Defendants associated with those claims, are severed from this action and transferred to the Western District of New York.

This District will retain jurisdiction over the claims that arose while Plaintiff was incarcerated at Great Meadow C.F., and the Court therefore reviews the sufficiency of those claims below. The Court takes no position regarding the sufficiency of the claims that have been severed and will be transferred to the Western District of New York, leaving that determination to the Western District of New York.

### D. Sufficiency of Plaintiff's Remaining Claims

---

[7] Five Points C.F. is located in Seneca County.

[8] "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all the parties have consented." 28 U.S.C. § 1404(a). Under 28 U.S.C. § 1391(b), "[a] civil action may be brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."

"42 U.S.C. § 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive rights; it provides civil litigants a procedure to redress the deprivation of rights established elsewhere. Id. (citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985)). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under the color of state law deprived him of a federal right." Id.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'" Austin v. Pappas, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. See Polk Cty. v. Dodson, 454 U.S. 312, 325 (1981); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003); Wright, 21 F.3d at 501.

Rather, supervisory personnel may be considered "personally involved" in an alleged constitutional violation only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to

18

continue, a policy or custom under which the violation occurred, (4) were grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that a violation was occurring. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).[9]

### 1. *Official Capacity Claims*

The Eleventh Amendment has long been construed as barring lawsuits against states in federal court, under the fundamental principle of sovereign immunity. U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); Hans v. Louisiana, 134 U.S. 1, 10–21 (1890); Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. Gollomp v. Spitzer, 568 F.3d 355, 365–66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through § 1983, see Quern v. Jordan, 440 U.S. 332, 343–45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in Plaintiff's Complaint. See generally Trotman v. Palisades Interstate Park Comm'n, 557 F.2d

---

[9]  The Second Circuit has not yet addressed how the Supreme Court's decision in Iqbal affected the standards in Colon for establishing supervisory liability. See Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013) (noting that Iqbal may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of Iqbal on Colon because the complaint "did not adequately plead the Warden's personal involvement even under Colon"). For purposes of this Decision and Order, the Court assumes that all five categories under Colon remain valid.

35, 38–40 (2d Cir. 1977); Dawkins v. State of New York, No. 93-CV-1298, 1996 WL 156764, at *2 (N.D.N.Y. 1996).

The Eleventh Amendment bars suits for damages against state officials acting in their official capacities. See Kentucky v. Graham, 473 U.S. 159, 169 (1985) (explaining that a claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment); Ying Jing Gan v. City of New York, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); Severino v. Negron, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under § 1983] for money damages against state officials in their official capacities.")

Accordingly, to the extent that Plaintiff seeks monetary damages under § 1983 against any named defendant remaining in this action in his or her official capacity, such claims are dismissed with prejudice pursuant to §§ 1915(e)(2)(B) and 1915A(b) as barred by the Eleventh Amendment.

### 2. Medical Indifference Claims

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the Eighth Amendment's protection from the imposition of cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 102, 104 (1976). The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and that is incompatible with "the evolving standards of decency that mark the progress of a maturing

20

society." Id.; see also Whitley v. Albers, 475 U.S. 312, 319 (1986) (citing Estelle). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citing Rhodes v. Chapman, 452 U.S. 337, 349 (1981)).

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle, 429 U.S. at 104). "First, the alleged deprivation must be, in objective terms, sufficiently serious." Chance, 143 F.3d at 702 (internal quotation marks and citations omitted). Addressing the objective element, to prevail, a plaintiff must demonstrate a violation sufficiently serious, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996). "Second, the defendant must act with a sufficiently culpable state of mind." Chance, 143 F.3d at 702 (internal quotation marks and citations omitted). That is, the plaintiff must demonstrate that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837; see also Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999) (with respect to the subjective element, a plaintiff must also demonstrate that defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness'").

Non-medical personnel may be held liable for deliberate indifference to medical needs where a plaintiff demonstrates that the prison personnel intentionally denied or delayed access to medical care or intentionally interfered with medical treatment once it was prescribed. See Banks v. No. 8932 Corr. Officer, No. 11-CV-8359, 2013 WL 673883, at *4 (S.D.N.Y. Feb. 25,

2013) ("A prison guard's deliberate indifference to a serious medical need of a prisoner means intentionally denying or delaying access to medical care or intentionally interfering with medical treatment once it was prescribed."); see also Estelle, 429 U.S. at 104–05 (noting that deliberate indifference may be manifested when prison guards intentionally deny or delay access to medical care).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed,[10] Plaintiff has alleged sufficient facts to warrant a response to his medical indifference claims. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 3. Excessive Force and Failure-to-Intervene Claims

The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." Blyden, 186 F.3d at 262–63 (internal quotations omitted) (citing Hudson v. McMillian, 503 U.S. 1, 8 (1992)).[11]

"The Eighth Amendment [also] requires prison officials to take reasonable measures to

---

[10] See, e.g., Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008).

[11] In this regard, while "a de minimis use of force will rarely suffice to state a constitutional claim," Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993), the malicious use of force to cause harm constitutes an Eighth Amendment violation per se because in such an instance "contemporary standards of decency are always violated." Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7 (citing Whitley, 475 U.S. at 321–22); see also Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973).

guarantee the safety of inmates in their custody." Hayes v. New York City Dep't of Corr., 84

F.3d 614, 620 (2d Cir. 1996) (citing Farmer, 511 U.S. at 832). Law enforcement officials,

including prison officials, can be held liable under § 1983 for failing to intervene in a situation

where another official is violating an inmate's constitutional rights, including the use of

excessive force, in their presence. Curley v. Vill. of Suffern, 268 F.3d 65, 72 (2d Cir. 2001); see

also Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (prison official's Eighth Amendment

duty to take reasonable measures to guarantee the safety of inmates in their custody includes a

duty to protect inmates from harm threatened by other officers); Terebesi v. Torreso, 764 F.3d

217, 244 (2d Cir. 2014) ("[I]nsofar as the raid plan included the use of substantial and violent

force, the plaintiff alleged facts suggesting that every defendant had the opportunity to

intervene. Whether some of the defendants were in fact unable to intercede in particular uses of

force, either because they were not involved in the planning process, or because of the manner,

place, and timing of their deployment in the raid itself, is properly a question for a jury.").

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be

liberally construed, the Court finds that Plaintiff's Eighth Amendment excessive force and

failure-to-intervene claims require a response. In so ruling, the Court expresses no opinion as to

whether these claims can withstand a properly filed dispositive motion.

### 4. Sexual Abuse Claim

"Because sexual abuse of a prisoner by a corrections officer may constitute serious harm

inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are

cognizable as Eighth Amendment claims." Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir.

1997). "A corrections officer's intentional contact with an inmate's genitalia or other intimate

area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." Crawford v. Cuomo, 796 F.3d 252, 256–57 (2d Cir. 2015).

Once again mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that Plaintiff's Eighth Amendment sexual abuse claim also requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### 5. Unlawful Search Claim

The Supreme Court has upheld the practice of conducting visual body-cavity searches of pre-trial detainees following contact visits, finding that the Fourth Amendment does not require probable cause for correction officials to conduct such searches; instead, such searches are subject to a reasonableness standard. Bell v. Wolfish, 441 U.S. 520, 558–60 (1979); see also Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 330 (2012) (holding that arrestees who are committed to the general population of a detention center may be subject to a close visual inspection while undressed). The Second Circuit and district courts within the Circuit have also upheld routine random strip searches, including body-cavity inspections, performed on prison inmates. See Covino v. Patrissi, 967 F.2d 73, 76–80 (2d Cir. 1992); see also Hurley v. Ward, 584 F.2d 609, 612 (2d Cir. 1978) (reversing portion of injunction prohibiting strip searches of prison inmates); Castro-Sanchez v. N.Y. State Dep't of Corr. Servs., No. 10-CV-8314, 2011 WL 6057837, at *9 (S.D.N.Y. Dec. 6, 2011) ("Routine random strip searches of inmates, including body cavity inspections, do not violate the Fourth Amendment."). Assessing the reasonableness of a strip search "requires a balancing of the need

24

for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell, 441 U.S. at 559.

An inmate bears the burden of showing that a search was unreasonable, Shabazz v. Pico, 994 F. Supp. 460, 473 (S.D.N.Y. 1998), so at the pleading stage, a plaintiff must "plead facts sufficient to give rise to a plausible inference" that the search he challenges was unreasonable under the standards described above. Simmons v. Cripps, No. 12-CV-1061, 2013 WL 1290268, at *21 (S.D.N.Y. Feb. 15, 2013), report and recommendation adopted by 2013 WL 1285417 (S.D.N.Y. Mar. 28, 2013).

At this very early stage of the proceeding, the Court finds that Plaintiff has alleged sufficient facts to warrant a response to his Fourth Amendment unlawful search claim. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### 6. Conditions-of-Confinement Claims

The Second Circuit, in addressing the rights protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds sub nom. Bell, 441 U.S. 520; Lareau v. Manson, 651 F.2d 96, 106 (2d Cir. 1981). To demonstrate that conditions of confinement constitute cruel and unusual punishment in violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective element. See Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996). A plaintiff must demonstrate that (1) the conditions of confinement resulted in "unquestioned and serious deprivations of

basic human needs," Anderson v. Coughlin, 757 F.2d 33, 35 (2d Cir. 1985); see also Jolly, 76

F.3d at 480, and (2) the defendants acted with "deliberate indifference." Wilson v. Seiter, 501

U.S. 294, 303–04 (1991).

"When a plaintiff alleges multiple unconstitutional conditions of confinement, the court

may aggregate the effect of all of the conditions, 'but only when they have a mutually enforcing

effect that produces the deprivation of a single, identifiable human need such as food, warmth,

or exercise.'" Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (quoting Wilson, 501 U.S. at

304). "Each condition 'must be measured by its severity and duration, not the resulting injury,'

and the conditions are not subject to 'a bright-line durational or severity threshold.'" Van

Hoven v. City of New York, No. 16-CV-2080, 2018 WL 5914858, at *7 (S.D.N.Y. Aug. 21,

2018) (quoting Darnell v. Pineiro, 849 F.3d 17, 32 (2d Cir. 2017)), report and recommendation

adopted by 2018 WL 4417842 (S.D.N.Y. Sept. 17, 2018).

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be

liberally construed, the Court finds that Plaintiff's Eighth Amendment conditions-of-

confinement claims require a response. In so ruling, the Court expresses no opinion as to

whether these claims can withstand a properly filed dispositive motion.

### 7. Due Process Claims

To successfully state a claim under § 1983 for denial of due process, a plaintiff must

establish both the existence of a protected liberty or property interest, and that he or she was

deprived of that interest without being afforded sufficient process. Shakur v. Selsky, 391 F.3d

106, 118 (2d Cir. 2004) (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460

(1989)). Due process generally requires that the state afford individuals "some kind of hearing"

prior to depriving them of a liberty or property interest. DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003).

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). The duration of the challenged confinement, while not determinative, is a significant factor under Sandin. The Second Circuit generally takes the position that normal confinement in a segregated housing unit of 101 days or less does not constitute an "atypical and significant hardship" under Sandin. Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citing Sealey v. Giltner, 197 F.3d 578, 589–90 (2d Cir. 1999)).[12] The "atypicality" inquiry under Sandin is normally a question of law. Colon, 215 F.3d at 230–31; Sealey, 197 F.3d at 585. In making that determination, the Court must consider the specific circumstances of the confinement, including both the duration and the conditions thereof. Id.

The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include: advance written notice of the charges; a fair and impartial hearing officer; a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence; and a written statement of the evidence upon which the hearing officer relied in making his determination. Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citing Wolff v. McDonnell, 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported

---

[12] A New York state inmate confined in SHU is placed in a solitary confinement cell for 23 hours a day. The inmate may exercise in the yard for one hour each day, is limited to two showers a week, and may not work or attend programming. See Colon v. Howard, 215 F.3d 227, 230 (2d Cir. 2000); N.Y. COMP. CODES R. & REGS., tit. 7, §§ 304.1–.14.

by "some" "reliable evidence." <u>Id.</u> (citing <u>Superintendent v. Hill</u>, 472 U.S. 445, 455 (1985)).

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that Plaintiff's Fourteenth Amendment due process claims require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 8. *Equal Protection Claim*

The Equal Protection Clause requires that the government treat all similarly situated people alike. <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" <u>Bizzarro v. Miranda</u>, 394 F.3d 82, 86 (2d Cir. 2005) (quoting <u>LeClair v. Saunders</u>, 627 F.2d 606, 609–10 (2d Cir. 1980)). To state a viable claim for denial of equal protection, a plaintiff generally must allege "purposeful discrimination . . . directed at an identifiable or suspect class." <u>Giano v. Senkowski</u>, 54 F.3d 1050, 1057 (2d Cir. 1995). In the alternative, under a "class of one" theory, a plaintiff must allege that he has been intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment. <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000); <u>DeMuria v. Hawkes</u>, 328 F.3d 704, 706 (2d Cir. 2003).

"[V]erbal harassment or profanity alone, unaccompanied by an injury[,] no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983."

Moncrieffe v. Witbeck, No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (quoting Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998)). Additionally, "threats do not amount to violations of constitutional rights." Id. (quoting Malsh v. Austin, 901 F. Supp. 757, 763 (S.D.N.Y. 1995)).

However, "[c]ourts in this circuit and elsewhere have held that officers' use of racial epithets may be regarded as direct evidence of racial animus and, when combined with physical abuse or other unlawful actions, may establish an equal protection violation." Ali v. Connick, 136 F. Supp. 3d 270, 280 (E.D.N.Y. 2015); see also Cole v. Fischer, 379 F. App'x 40, 43 (2d Cir. 2010) ("When the verbal harassment and simultaneous physical abuse alleged in the amended complaint are considered together, we have little trouble concluding that plaintiff's allegations were sufficient to state a § 1983 claim for discrimination on the basis of race and religion."); cf. Abuhouran v. Acker, No. 04-CV-2265, 2005 WL 1532496, at *4–5 (E.D. Pa. June 29, 2005) (denying dismissal of an Equal Protection claim where an Arab-American inmate alleged that the defendant officer mocked the plaintiff because of his "name, accent, and religion," called him "a little terrorist," and subjected him to harassing conduct and unfavorable treatment).

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that Plaintiff's Fourteenth Amendment equal protection claim against Gilles requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

## IV.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the claims arising out of Plaintiff's confinement at Five Points Correctional Facility are severed and transferred to the Western District of New York; and it is further

**ORDERED**, that the Clerk shall advise the Clerk of the Western District of New York, in writing, of the entry of this Order and provide that Clerk with all information necessary for the Western District Clerk to electronically access the documents filed in this action; and it is further

**ORDERED**, that Defendants Perez, Tomas, and Nurse Jane Doe are **TERMINATED** from this action; and it is further

**ORDERED**, that the following claims asserted against the defendants remaining in the action before this Court in their individual capacities **SURVIVE** sua sponte review and require a response: (1) Plaintiff's Eighth Amendment medical indifference claims against Defendants Goe, Karandy, Nesmith, Rocque, Christy, Morley, Tandy-Walters, Gilles, Correction Officer Boule, Correction Officer Rich, Correction Officer Papa, Correction Officer John Doe #1, Correction Officer John Doe #2, Correction Officer Jane Doe #3, Miller, McIntosh, Collins, and Caron; (2) Plaintiff's Eighth Amendment excessive force and failure-to-intervene claims against Defendants Gilles, Correction Officer Boule, Correction Officer Rich, Correction Officer Papa, Correction Officer John Doe #1, Correction Officer John Doe #2, Correction Officer Jane Doe #3, Nesmith, and Christy; (3) Plaintiff's Eighth Amendment sexual abuse claim against Defendants Gilles, Boule, Rich, Papa, John Doe #1, John Doe #2, and Jane Doe #3; (4) Plaintiff's Fourth Amendment unlawful search claim against Defendants Gilles, Boule, Rich, Papa, John Doe #1, John Doe #2, and Jane Doe #3; (5) Plaintiff's Eighth Amendment

30

conditions-of-confinement claim against Defendants Miller, McIntosh, Collins, and Caron; (6) Plaintiff's Fourteenth Amendment due process claims against Defendants Murphy and Collins; and (7) Plaintiff's Fourteenth Amendment equal protection claim against Defendant Gilles; and it is further

**ORDERED**, that Plaintiff's official capacity claims against the defendants remaining in the action before this Court are **DISMISSED with prejudice** pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b) as barred by the Eleventh Amendment and for failure to state a claim upon which relief may be granted;[13] and it is further

**ORDERED**, that upon receipt from Plaintiff of the documents required for service, the Clerk shall issue summonses and forward them, along with copies of the Complaint, to the United States Marshal for service upon Defendants Goe, Karandy, Nesmith, Rocque, Christy, Morley, Tandy-Walters, Gilles, Correction Officer Boule, Correction Officer Rich, Correction Officer Papa, Miller, McIntosh, Collins, and Caron.[14] The Clerk shall also forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED**, that Defendants Goe, Karandy, Nesmith, Rocque, Christy, Morley, Tandy-Walters, Gilles, Correction Officer Boule, Correction Officer Rich, Correction Officer

---

[13] Generally, when a district court dismisses a pro se action sua sponte, the plaintiff will be allowed to amend his action. See Gomez, 171 F.3d at 796. However, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000); see also Pucci v. Brown, 423 F. App'x 77, 78 (2d Cir. 2011).

[14] Summonses will not issue for the "Doe" defendants because the U.S. Marshal cannot effect service on an individual who has not been identified by name.

Papa, Miller, McIntosh, Collins, and Caron, or their counsel, respond to the Complaint as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED**, that Plaintiff must take reasonable steps to ascertain the identities of Defendants Correction Officer John Doe #1, Correction Officer John Doe #2, and Correction Officer Jane Doe #3 and, when identified, seek to amend the Complaint to add these individuals as defendants in this action pursuant to Federal Rule of Civil Procedure 15(a); and it is further

**ORDERED**, that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; Plaintiff's failure to do so will result in the dismissal of this action**; and it is further

**ORDERED**, that the Clerk serve a copy of this Decision and Order on Plaintiff.

**IT IS SO ORDERED.**

DATED:      July 29, 2020
            Albany, New York


_____
Lawrence E. Kahn
U.S. District Judge