## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

ANGELO D. JOHNSON,

                                        Plaintiff,

        v.                                                      9:20-CV-622
                                                                (LEK/ATB)

BROWN, et al.,

                                        Defendants.

ANGELO D. JOHNSON, Plaintiff, pro se
JONATHAN REINER, Asst. Attorney General, for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

### REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the
Honorable Lawrence E. Kahn, Senior U.S. District Judge.  Presently before the court is
a motion for summary judgment pursuant to Fed. R. Civ. P. 56, filed by defendants at
Great Meadow Correctional Facility ("Great Meadow")–Superintendent Christopher
Miller, First Deputy Superintendent Donita McIntosh, Deputy Superintendent Gerard
Caron, Assistant Deputy Superintendent Melissa Collins, Lieutenant George Murphy,
Sergeant Nathaniel Gilles, Correction Officer ("CO") Preston Boule, CO Eric Rich, and
CO Daniel Papa–as well as by these other named defendants associated with the New
York State Department of Corrections and Community Supervision ("DOCCS")–Dr.
Eric Goe, Dr. David Karandy, Physician Assistant ("PA") Ted Nesmith, Nurse Marcia
Rocque, Nurse Christy Watkins, Dr. John Morley, and DOCCS Regional Health
Administrator Mary Tandy-Walters. (Dkt. No. 63).  Plaintiff has failed to respond to the
defendants' motion, despite being given an extension of time to do so. (Dkt. Nos. 65,
66).

**DISCUSSION**

## I.    **Procedural Background**

Plaintiff originally filed this action in the Southern District of New York ("S.D.N.Y."). (Complaint ("Compl.") (Dkt. No. 2). On May 14, 2020, District Judge Colleen McMahon, S.D.N.Y., granted plaintiff's application to proceed in forma pauperis ("IFP"). (Dkt. No. 4). On June 3, 2020, S.D.N.Y. District Judge Kenneth M. Karas severed and transferred plaintiff's claims arising out of his incarceration at Great Meadow and Five Points Correctional Facility to the Northern District of New York. (Dkt. No. 6).

On June 29, 2020, after conducting an initial review of the transferred claims, Judge Kahn issued an order, dismissing some of the plaintiff's claims, transferring his claims arising at Five Points Correctional Facility to the Western District of New York, and directing service upon, and a response from, the remaining defendants. (Dkt. No. 8 at 30-32). Judge Kahn directed plaintiff to take reasonable steps to identify the "John" or "Jane Doe" defendants named in the complaint and seek to amend the complaint to add their names.[1] (Dkt. No. 8 at 32).

There are sixteen remaining defendants, and the claims against them are as follows:

1.    Defendant Marcia Rocque was deliberately indifferent to plaintiff's medical care on October 29, 2018 by taking away Plaintiff's migraine medication. (Compl. ¶¶ 45–46).

---

[1] Plaintiff has failed to identify any of the John or Jane Doe defendants, notwithstanding the opportunity for discovery. (*See* Dkt. Nos. 51 (unrelated motion to compel); 58 (order granting motion in part)).

2.  Deliberate indifference to plaintiff's medical care by:
    a.  Defendant Eric Goe on November 1, 2018. (Compl. ¶¶ 47–50).
    b.  Defendant Ted Nesmith on November 16 and 21, 2018. (Compl. ¶¶ 51, 53).
    c.  Defendants Goe and David Karandy on December 5, 2018 through February 19, 2019. (Compl. ¶¶ 54–56).
    d.  Defendant Goe on May 17, 2019. (Compl. ¶ 72).
    e.  Defendants Goe and Karandy in July 2019. (Compl. ¶ 138).

3.  Deliberate indifference to plaintiff's medical care by failing to rectify other defendants' deficient care:
    a.  Mary Tandy-Walters on December 14, 2018. (Compl. ¶¶ 68, 65[2]–66[2]).[2]
    b.  John Morley on February 5, 2019. (Compl. ¶¶ 67[2]–68[2]).

4.  On June 17, 2019, defendants Preston Boule, Nathaniel Gilles, Daniel Papa, and Eric Rich, along with three John/Jane Doe defendants, threw plaintiff on a table, removed his clothes, sexually abused him by sliding a hand between his buttocks, and took mocking pictures of plaintiff's buttocks. (Compl. ¶¶ 85–113).
    a.  The claims against all of these defendants include: denial of adequate medical care, excessive force, failure to intervene (with respect to excessive force), sexual abuse, and unlawful search under the Fourth Amendment.
    b.  Defendant Gilles is claimed to be the "ringleader," and plaintiff asserts an Equal Protection claim against him.
    c.  Plaintiff asserts a claim of denial of medical care against defendant Nesmith (PA) relative to this incident.

5.  Between June 23 and July 9, 2019, defendant George Murphy allegedly violated plaintiff's Due Process rights under the Fourteenth Amendment by failing to provide a fair disciplinary hearing. (Compl. ¶¶ 111–17).

6.  On July 10, 2019, Defendants Gilles, Nesmith, and Christy Watkins were deliberately indifferent to plaintiff's medical needs, used excessive force, and failed to intervene by putting a harmful concoction on plaintiff's

---

[2] As noted by defense counsel, after paragraph 68 of plaintiff's complaint, he returned to paragraph 65. (Def.s' Mem. at 2 n.3). The bracketed numbers indicate the second appearance of the paragraph number.

mouth. (Compl. ¶¶ 118–26).

7.    From July 11-15, 2019, defendants Gerard Caron, Melissa Collins, Donita McIntosh, and Christopher Miller were deliberately indifferent to plaintiff's medical needs and the conditions of his confinement by ignoring his complaints regarding such conditions. (Compl. ¶¶ 129–34).

8.    At some point prior to January 27, 2020, defendant Collins violated plaintiff's Due Process rights under the Fourteenth Amendment by presiding over a "secret" disciplinary hearing. (Compl. ¶¶ 149–52).

(Def.s' Mem. at 1-3).  Most of plaintiff's claims allege constitutionally-inadequate medical care.  Some allege excessive force, and one claim involves an alleged incident of sexual assault in conjunction with excessive force.  Plaintiff also claims denial of procedural due process with respect to disciplinary hearings.  Rather than include a lengthy statement of facts at the outset, I will discuss the relevant facts and evidence of record in connection with my analysis of the plaintiff's particular claims.

## II.    <u>Summary Judgment</u>

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

4

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

"When the opposing party fails to respond to the moving party's Rule 56.1 Statement, the material facts contained in the moving party's statement are deemed admitted as a matter of law." *Antwi v. Health & Human Sys. (Ctrs.) F.E.G.S.*, No. 13-CV-0835, 2014 WL 4548619, at *4 (S.D.N.Y. Sept. 15, 2014); *see also Genova v. County of Nassau*, 851 F. App'x 241, 244 (2d Cir. 2021)). Generally, failure to respond to a motion for summary judgment results in summary judgment for the moving party, "once the court assures itself that Rule 56's other requirements have been met." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009)). However, "a district court must ensure that there is support in the record for facts contained in unopposed Rule 56.1 statements before accepting those facts as true." *United States v. Abady*, No. 03-CV- 1683, 2004 WL 444081, at *3 (S.D.N.Y. Mar. 11, 2004) (citing *Giannullo v.*

*City of New York*, 322 F.3d 139, 140–43 (2d Cir. 2003)).  Moreover, a pro se plaintiff must be notified of the consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  In this case, plaintiff was sent a specific warning by the court of the consequences of a failure to respond.[3] (Dkt. No. 64 at 2).

## III.  Exhaustion of Administrative Remedies

### A.    Legal Standards

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)), abrogated on other grounds by *Ross v. Blake*, 578 U.S. 632 (2016).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

In order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the

---

[3] Plaintiff was aware of this responsibility.  He asked for, and was granted an extension of time to file his response to January 24, 2022. (Dkt. Nos. 65-66). At the same time, plaintiff filed a change-of-address notification, indicating that he had been released from incarceration. (Dkt. No. 65).  He failed to submit a response to the summary judgment motion or to ask for an extension of the deadline within the time set by the court.

inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *Woodford,* 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process, known as the Incarcerated Grievance Program ("IGP").[4]  The inmate must first file a grievance with the Incarcerated Grievance Resolution Committee ("IGRC").  N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the IGRC may be appealed to the Superintendent of the Facility.  *Id*. § 701.5(c).  Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC").  *Id*. § 701.5(d).  The court also notes that the regulations governing the IGP encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance."  *Id*. § 701.3(a) (Inmate's Responsibility).  There is also a special section for complaints of harassment.  *Id*. § 701.8.  Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the Superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) & (I), 701.5.

There is also a relaxed exhaustion requirement for bringing claims of sexual assault in the administrative process.  If an inmate wishes to bring a claim of "sexual abuse" or "sexual harassment," as defined in DOCCS Directive # 4027A and Directive

---

[4] The IGP was formerly known as the Inmate Grievance Program.

# 4027B, he need only report the incident. *See* 7 NYCRR § 701.3(i); Prison Rape

Elimination Act ("PREA")[5] Standards, 28 C.F.R. § 115.06; *Sheffer v. Fleury*, No. 18-

CV-1180 (LEK/ DJS), 2019 WL 3891143, at *3 (N.D.N.Y. Aug. 19, 2019). Section

701.3(i) states:

> [A]ny allegation concerning an incident of sexual abuse or
> sexual harassment shall be deemed exhausted if official
> documentation confirms that: an inmate who alleges being the
> victim of sexual abuse or sexual harassment reported the
> incident to facility staff; in writing to Central Office Staff; to
> any outside agency that the Department has identified as
> having agreed to receive and immediately forward inmate
> reports of sexual abuse and sexual harassment to agency
> officials under the PREA Standards; or to the Department's
> Office of the Inspector General.

*Id.* (citations omitted). If an inmate does file a grievance regarding a complaint of

sexual abuse or sexual harassment, "[t]he complaint shall be deemed exhausted upon

filing." *Id.* Finally, "[a] sexual abuse or sexual harassment complaint may be submitted

at any time." *Id.*

Prior to *Ross v. Blake, supra*, the Second Circuit utilized a three-part inquiry to

determine whether an inmate had properly exhausted his administrative remedies. *See*

*Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of*

*New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether

the administrative remedies were available to the inmate; (2) whether defendants' own

actions inhibiting exhaustion estops them from raising the defense; and (3) whether

"special circumstances" justify the inmate's failure to comply with the exhaustion

---

[5] 34 U.S.C. § 30301, et seq.

8

requirement. *Id.*

In *Ross*, the Supreme Court made it clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 578 U.S. 632, 640 (2016). "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, 578 U.S. at 639). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, 578 U.S. at 642. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id; see also Riles*, 2016 WL 4572321 at *2.

## B.    Analysis

Defendant concedes that plaintiff has exhausted his administrative remedies as to two of his claims: (1) upon his admission to Great Meadow on October 29, 2018, during plaintiff's initial medical evaluation, defendant Rocque deprived him of his needed migraine medication, knowing that it would cause plaintiff severe pain.[6] (Compl. ¶¶ 45-47), and (2) plaintiff's claim against Dr. Goe, involving a November 1, 2018 medical appointment, after which Dr. Goe allegedly "maliciously" failed to order refills of plaintiff's migraine medications, even though he promised plaintiff he would

---

[6] Claim # 1 above. The court has numbered the claims as indicated at the beginning of this Report-Recommendation on pp.3-4.

do so.[7] (Compl. ¶¶ 48-50).

Defendants argue that plaintiff has failed to exhaust every other remaining claim herein. In support of their argument, defendants have filed the declaration of Rachel Seguin, the Assistant Director of the IGP and the declaration of Sidney Frierson, an Investigator assigned to the DOCCS Sex Crimes Division of the Office of Special Investigations ("OSI"). (Seguin Decl.) (Dkt. No. 63-3); (Frierson Decl.) (Dkt. No. 63-5).

In her capacity as Assistant Director of the IGP, Seguin is the custodian of the records maintained by the CORC. (Seguin Decl. ¶ 11). At defendants' request, Assistant Director Seguin searched the CORC records for appeals received from grievances filed by plaintiff. (Seguin Decl. ¶ 13). Assistant Director Seguin cites three grievances brought by plaintiff at Great Meadow: Grievance Nos. GM-64599-19, GM-63809-18, and 63852-18.

Plaintiff filed Grievance No. 63809-18 on November 8, 2018. (Seguin Decl. Ex. A & Ex. C). The grievance was entitled "Wants to Be Seen." (*Id.*) In the grievance, plaintiff claimed that upon his admission to Great Meadow, he explained his medical conditions to staff, and stated that he had "self-carry" medications, but he was deprived of these medications upon arrival. When he attempted to explain this to the "nurse," on the 7:00 a.m. to 3:00 p.m. shift, plaintiff was ignored. (Seguin Decl. Ex. C at p.42). Plaintiff appealed the denial of this grievance to the CORC. (*Id.*) Thus, plaintiff exhausted his claim alleging that defendant Rocque took away his pain medication

---

[7] Claim # 2(a) above.

upon arrival to the facility. (Claim # 1 Compl. ¶¶ 45-46).

Plaintiff filed Grievance No. GM-63852-18 on November 26, 2018, entitled "Discrimination/Medical Treatment." (Seguin Decl. Ex. D). Plaintiff complained that Dr. Goe ignored plaintiff's complaints of migraine headaches on November 1, 2018. (Seguin Decl. Ex. E at 52). Plaintiff claimed that the improper medical care was related to racial discrimination by Dr. Goe. (*Id.*) Plaintiff appealed the denial of this grievance to the CORC. (*Id.*) Thus, plaintiff has exhausted his claim that Dr. Goe denied him proper medical treatment on November 1, 2018. (Claim # 2(a) Compl. ¶¶ 47-50).

Plaintiff filed his next Grievance No. GM-64599-19 almost one year later, on September 27, **2019**. (Seguin Decl. Ex. A). The grievance is entitled "Medicine for Chronic Right Knee Pain." (Seguin Decl. Ex. A, B at CM/ECF p.15). The summary of the grievance states that Dr. Karandy, Dr. Gore,[8] and Nurse Administrator Barry deprived plaintiff of adequate pain medication for his knee. (Seguin Decl. Ex. B at p.16). Plaintiff alleged that these individuals ignored his complaints, and that he had not received proper care since he arrived at Great Meadow, despite the doctors' knowledge that plaintiff had a chronic problem prior to arriving at the facility. (*Id.*) Plaintiff requested adequate pain medication, care for his right knee, and a cane. (*Id.*) Plaintiff also alleged problems with his eyesight and his need for contact lenses. (Seguin Decl. Ex. B at 20). Plaintiff appealed this grievance to the CORC.[9]

---

[8] Plaintiff's actual grievance refers to Dr. Goe. (Seguin Decl. Ex. B at 17-18).

[9] Plaintiff's appeal to the superintendent also made a passing reference to "pinched nerves." (Seguin Decl. Ex. B at 23). During the investigation, the nurses discussed plaintiff's neck and back pain. (*Id.* at 25) (noting that there were three "complaints" from September 13, 2019 - knee, contact lenses, and neck/back pain).

### 1. Defendants Goe and Karandy (Compl. ¶¶ 54-56, 72, 138) (Claims ## 2(c)-2(e)).

Defendants argue that the grievance GM-64599-19, filed in September of 2019, did not include the conduct which plaintiff alleges in the instant complaint against Dr. Goe and Dr. Karandy between December 5, 2018 and February 19, 2019 (Dr. Goe and Dr. Karandy); on May 17, 2019 (Dr. Goe); and on July 19, 2019 (Dr. Goe and Dr. Karandy). "In order to exhaust . . . inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) (finding the PLRA exhaustion requirement was "not dissimilar to the rules of notice pleading").

The grievances that were appealed to the CORC as discussed above all involve plaintiff's medical care. The September 2019 grievance claimed that the actions of defendants Goe and Karandy had been going on since the time that plaintiff arrived at Great Meadow. (Seguin Decl. Ex. B at 16-21) (plaintiff complained about his knee, back, neck, and contact lenses). The court understands that plaintiff did not assert every action in his grievance by these two defendants that he now alleges in his complaint. However, with respect to these two defendants, the court finds that plaintiff gave the authorities sufficient information about the alleged conduct for officials to take appropriate responsive measures. In fact, a review of the investigation related to the September 2019 grievance shows that prison officials reviewed plaintiff's previous medical records to establish that he had been given proper care by these defendants.

(Seguin Decl. Ex. B).  Thus, this court will not recommend dismissing the remainder[10] of plaintiff's medical care claims against defendants Goe and the claims against defendant Karandy for failure to exhaust.[11] (Compl. ¶¶ 54-56, 72, 138).

### 2.    PA Nesmith (Compl. ¶¶ 51, 53, 87, 89, 92) (Claims ## 2(b), 4(c))

The court does not find that grievance GM-64599-19 exhausted plaintiff's claims against defendant PA Nesmith.  Plaintiff alleges in his complaint that PA Nesmith saw plaintiff on November 16 and November 21, 2018, and each time refused to address plaintiff's complaints of severe pain. (Compl. ¶¶ 51, 53).  Plaintiff also claims that defendant Nesmith tried to suffocate plaintiff with a "harmful concoction" on his hands prior to the June 17, 2019 incident discussed below.[12] (Compl. ¶ 87, 89, 92).  Plaintiff never mentions defendant Nesmith in any of his exhausted grievances.  This is not akin to a situation in which plaintiff has failed to name, in a grievance, certain individuals in connection with an incident involving several defendants. *See Espinal v. Goord*, 558 F.3d 119, 127-28 (plaintiff exhausted claims with respect to all people and claims related to the same incident even if he did not name each of the individuals in the grievance).

---

[10] As stated above, defendants concede that plaintiff has exhausted his claim that defendant Goe failed to give plaintiff constitutionally adequate medical care on November 1, 2018, shortly after plaintiff was transferred to Great Meadow.

[11] Defendants have also argued that plaintiff's claims against these defendants fail on the merits, and the court will discuss such arguments below.

[12] It appears that defendant Nesmith was not present either for the alleged physical and sexual assault that plaintiff alleges occurred after he was taken to another room by defendants Gilles and the other officers on June 17, 2019.  Thus, defendant Nesmith's actions on June 17, 2019 are limited to the application of the alleged "harmful concoction" that he used to revive plaintiff, an incident as to which plaintiff has not exhausted his administrative remedies.

In this case, plaintiff's claims against defendant Nesmith occurred on different days than those against defendants Goe and Karandy, and the June 17, 2019 incident is completely unrelated to plaintiff's other medical care claims. Assistant Director Seguin states that her investigation showed no grievances by plaintiff filed against defendant Nesmith for any of his alleged conduct. (Seguin Decl. ¶¶ 16, 17 & Ex. A). Officials would not have necessarily investigated claims against defendant Nesmith in conjunction with the grievances that plaintiff did exhaust, and officials would not have been alerted to conduct that occurred at a different time against a different defendant. This is distinguishable from ongoing conduct that was alleged in the exhausted grievances above as against defendants Goe and Karandy. However, if a reviewing court should find that the some of the claims against defendant Nesmith were related to those against Goe and Karandy, and therefore, exhausted, the claims against defendant Nesmith also fail on the merits as discussed below.

### 3. Mary Tandy-Walters and John Morley (Compl. ¶¶ 68, 65[2]-66[2], 67[2]-68[2]) (Claims ## 3(a), 3(b))

Defendant Mary Tandy-Walters is a DOCCS Regional Health Services Administrator in Albany, New York. (Tandy-Walters Decl. ¶ 1). Defendant John Morley was the Acting Deputy Commissioner/Chief Medical Officer of the DOCCS Division of Health Services. (*See* Tandy-Walters Decl. Ex. A). Plaintiff claims that he wrote to these two defendants in an effort to address his medical needs, but neither of them rectified the violations committed by others. (Compl. ¶¶ 68, 65[2]-66[2], 67[2]-68[2]).

Assistant Director Seguin states that plaintiff has never filed or appealed a

grievance related to the alleged actions of either of these two defendants. (Seguin Decl. ¶¶ 20-21 & Ex. A). Although plaintiff's claims against these two defendants are related to his medical care, none of the claims brought in plaintiff's exhausted grievances would have alerted officials to any improper conduct by these supervisory individuals. Thus, plaintiff has failed to exhaust his administrative remedies as against defendants Tandy-Walters and Morley, and the complaint may be dismissed against them for failure to exhaust.[13]

### 4.    Defendants Gilles, Boule, Papa, Rich, and three John/Jane Does (Compl. ¶¶ 85-113) (Claims ## 4(a), 4(b))

In the complaint, plaintiff claims that on June 17, 2019, defendants Gilles, assisted by defendants Boule, Papa, Rich, and three unidentified officers, beat plaintiff, threw him on a table, removed his clothes, and sexually abused him by sliding a hand between his buttocks and taking "mocking" pictures of his buttocks. Plaintiff alleges excessive force, sexual abuse, failure to intervene, and unlawful search, with an Equal Protection claim against defendant Gilles, who plaintiff believes was the "ringleader" of the incident.

Plaintiff claims that, on July 17, 2019, during morning recreation in the yard, he became dizzy and subsequently lost consciousness. (Compl. ¶ 83). He states that he

---

[13] The court notes that, notwithstanding the failure to exhaust, it is unlikely that plaintiff would be able to meet the new standard for a defendant's personal involvement with respect to these two supervisory defendants. *See Tangreti v. Bachmann,* 983 F.3d 609, 615-18 (2d Cir. 2020) (requiring that the defendant have violated plaintiff's rights him or herself, not merely by reason of the supervision of other individuals). This is particularly true for defendant Morley, because defendant Tandy-Walters responded to plaintiff's letter on defendant Morley's behalf. (Tandy-Walters Decl. Ex. A). It does not appear that defendant Morley had any contact with plaintiff either in person or in a supervisory capacity.

woke up as he was being escorted to the medical department. (Compl. ¶ 84). Plaintiff states that he was "maliciously" thrown onto the infirmary table, surrounded by defendants Gilles, Boule, Rich, Papa, John Doe #1, John Doe #2, and Jane Doe #3. (Compl. ¶ 85). Plaintiff was then "aggressively" interrogated by defendant Gilles about whether plaintiff was high on "K-2." (*Id.*)

Although plaintiff states that he tried to explain his medical problems to defendant Gilles, he continued to ask plaintiff whether he had taken K-2. (Compl. ¶ 87). While plaintiff was trying to persuade defendant Gilles that plaintiff was not on drugs, defendant Nesmith put a "harmful concoction" on his gloved hand and placed it over plaintiff's nose and mouth, suffocating the plaintiff as the other defendants held him down. (*Id.*) The "concoction" on PA Nesmith hands burned plaintiff's lips, making it difficult for plaintiff to bite defendant Nesmith. (Compl. ¶ 89). Defendant Nesmith finally stopped, and allegedly stated that plaintiff "looks conscious now." (Compl. ¶ 90).

Plaintiff then claims that defendant Gilles told the others to get plaintiff up and bring him to the second floor of the medical department.[14] Plaintiff claims that, as he was being taken to the second floor,[15] his handcuffs were cutting off his circulation, and

---

[14] In this paragraph of the complaint, plaintiff incorrectly states that the date was June 17, 2020. (Compl. ¶ 94). This appears to be a typographical error.

[15] Plaintiff does not allege that defendant Nesmith accompanied the other defendants to the second floor of the medical department. In fact, it is clear from plaintiff's deposition that any physical and/or sexual assault occurred after plaintiff was taken out of the infirmary and brought to the observation cell, and defendant Nesmith was not present. (Reiner Decl. Ex. A, Pl.'s Dep. at 28-38) (Dkt. No. 63-4). Plaintiff testified that defendant Gilles and the other officers began their assault in the hallway after he was taken out of the infirmary. (Pl.'s Dep. at 28-29).

his arms were extended backward, causing "excruciating" pain. (Compl. ¶ 95). Plaintiff states that, when they got to the second floor of the medical department, defendant Gilles ordered the other defendants to take plaintiff's restraints off. (Compl. ¶ 97). Plaintiff states that defendant Gilles ordered plaintiff to take all of his clothes off, and when plaintiff hesitated to remove his boxer shorts until the other defendants had left the room, defendant Gilles ordered the others to "fuck [plaintiff] up." (Compl. ¶ 98).

Plaintiff claims that defendants Boule, Rich, Papa, and the three Doe defendants punched and kicked plaintiff with blows to his body, arms, back, legs, and back of plaintiff's head. (Compl. ¶ 99). Defendant Gilles ordered the other defendants to pick plaintiff up off the ground and slam him against the wall, extending his arms backward, and "popping" his shoulder. (*Id.*) Defendant Gilles then ordered the other defendants to place the restraints back on plaintiff and place plaintiff face-down on the mattress. (Compl. ¶ 100).

At that time, one of the defendants pulled plaintiff's boxer shorts off. One defendant held one side of plaintiff's buttocks, while another defendant held the other side of plaintiff's buttocks while defendant Gilles slid his hands up and down between plaintiff's buttocks, telling the other defendants "'this is how it's done.'" (*Id.*) Plaintiff states that defendant Gilles then walked toward the cell door while the other defendants continued to abuse the plaintiff by opening and closing his "butt cheeks," placing their faces near his anus and asking if anyone was home." (Compl. ¶ 102). Defendant Gilles then ordered the other defendants to make sure that the handcuffs were "super tight." They left plaintiff naked in the cell. (Compl. ¶ 103).

Plaintiff claims that he went to the cell door to yell for a "grievance" and for medical assistance for his left shoulder. (Compl. ¶ 104). Plaintiff claims that defendant Gilles just laughed and left him in the cell. (Compl. ¶ 105). Plaintiff claims that he was left naked and in pain for hours before the restraints were removed and he was given boxer shorts to wear. (Compl. ¶¶ 105-106). Plaintiff claims that defendant Gilles came back later with some other officers and "staged false pictures" of plaintiff's injuries to "cover up" their alleged actions.[16] (Compl. ¶ 107).

Plaintiff alleges that, sometime during the evening of June 17, he spoke with an unidentified nurse, who came to his cell, accompanied by unidentified officers. Plaintiff alleges that he told the nurse about all of his injuries. (Compl. ¶ 108). The nurse did not "examine" plaintiff, but told him that she would "note" his complaints. (*Id.*) Plaintiff also alleges that he reported the sexual assault to the nurse, and asked for OMH,[17] but when the officers heard that plaintiff was making allegations against other officers, they terminated the nurse's interview. (Compl. ¶ 108).

Plaintiff states that he was held for observation because of his "seizure" in the yard. (Compl. ¶ 109). Plaintiff claims that, on June 18, 2019, a nurse from OMH came to speak with him, but that she was rude, "unethical," and only gave him "30 seconds" to tell his story. (*Id.*) She did not allow him to explain his "serious crisis." (*Id.*) She just walked away, without giving plaintiff her name. (*Id.*) Plaintiff was "cleared" later that day, but was taken to "punitive Ad Seg keeplock." (Compl. ¶ 110). Plaintiff was

---

[16] Plaintiff claims that defendant Gilles did this because plaintiff was asking for grievance forms. (Compl. ¶ 107).

[17] Office of Mental Health.

charged with misbehavior as a result of the incident. (Compl. ¶¶ 111-13).

Defendants argue that plaintiff failed to exhaust his administrative remedies with respect to the sexual abuse claim and any related claim of excessive force. Because plaintiff's claim deals with an allegation of sexual abuse, the more relaxed exhaustion standard applies. As stated above, in a case of alleged sexual abuse, plaintiff has only to alert one of several agencies or corrections officials of the sexual abuse.[18] *Sheffer v. Fleury*, 2019 WL 3891143, at *3 (quoting Section 701.3(i)). In this case, defendants concede that, in March of **2020**, plaintiff informed the Office of Special Investigations ("OSI") for DOCCS, that defendant Gilles and "six unknown corrections officers," sexually abused him on "June 11, 2019." (Def.s' Mem. at 11) (Dkt. No. 63-1). Defendants argue that plaintiff never reported an incident occurring on June 17, 2019, and therefore, failed to exhaust his administrative remedies with respect to any incident on that date. Defendants also argue that any excessive force claim asserted by plaintiff as occurring on the same date is not sufficiently "intertwined" with the sexual abuse claim to justify exhausting both claims through the relaxed procedure.

Defendants cite the declaration of Sidney Frierson, an OSI Sex Crimes Division investigator. (Frierson Decl.) (Dkt. No. 63-5). Investigator Frierson states that plaintiff filed a complaint on March 2, 2020, in which he alleged that, after being in the hospital, he was taken back to the cell block, where he was put in a cell and strip frisked. (Frierson Decl. ¶ 4). Plaintiff further claimed that the staff was "'playing in his ass,'" "'going in his ass,'" and "swiping their hands between his buttocks." (*Id.*) When

---

[18] As stated above, the inmate has several options, all of which result in immediate exhaustion of the claim.

interviewed on March 9, 2020, plaintiff told the OSI investigator that the perpetrators were defendant Gilles and "six unknown corrections officers." (Frierson Decl. ¶ 5).  In addition, plaintiff never mentioned a physical assault, which allegedly occurred prior to the sexual assault. (Frierson Decl. ¶ 6).  Inspector Frierson stated that plaintiff never made allegations against defendants Boule, Rich, or Papa and did not mention any conduct occurring after June 11, 2019. (Frierson Decl. ¶ 8).

It seems clear that the plaintiff has made an error in reporting the date of the incident to OSI,[19] because the facts are too similar to be a coincidence, and it is questionable that such an incident happened twice.  Plaintiff's description of the incident is almost identical to the OSI claim,[20] and it afforded officials the opportunity to investigate the claim.  Thus, the court will not recommend dismissal for failure to exhaust the sexual abuse claim.

Aside from the error in the date, defendants argue that the physical assault claim is not exhausted because it was not mentioned in the OSI claim and it was never separately exhausted through the grievance procedure.  However, plaintiff claims that

---

[19] The court notes that plaintiff signed his federal complaint on April 14, 2020, using the correct date of the incident, and he filed his OSI claim on March 2, 2020, reporting the wrong date. While it is perhaps questionable that plaintiff confused the dates in two documents created only a month apart, the mistake in his OSI claim could plausibly reflect a scrivener's error or a mental lapse, which plaintiff caught and corrected when preparing his complaint.

[20] A review of the medical records attached to defendants' motion corroborates defendant Gilles's declaration that an incident did occur on June 17, 2019, during which plaintiff was brought to the infirmary, ammonia applied to restore him to consciousness, and after which a strip search was performed. (Gilles Decl. ¶ 4; Nesmith Decl. ¶ 4 & Ex. A).  It is also clear from the disciplinary records attached to the declaration of defendant George Murphy, who conducted the subsequent disciplinary hearing, that a use of force occurred during the strip search. (Murphy Decl. & Ex. A) (Dkt. No. 63-12). The incident reportedly involved plaintiff reaching for his buttocks during the strip search and the officers having to use force to gain control of him. (*Id.*)  The facts seem too similar to plaintiff's 2020 report to be describing a different incident.

the physical assault happened immediately before the sexual assault, and was part of the same incident even though it was not raised specifically with OSI. (*See* Compl. ¶¶ 95-102). While investigating the alleged sexual assault, the investigator would necessarily examine the facts surrounding the incident. For purposes of exhaustion, this court finds that plaintiff gave defendants the opportunity to investigate the allegations. The court will not separate the physical from the sexual assault because plaintiff alleges that both were part of the same incident. As stated above, the plaintiff did not need to name every individual involved in the incident to exhaust his administrative remedies. *Espinal v. Goord*, *supra.*

### 5. Defendants Gilles, Nesmith, and Watkins[21] (Compl. ¶¶ 118-19, 125-26) (Claim # 6)

Plaintiff also complains of an incident which occurred on July 9 and 10, 2019 against defendants Gilles, Nesmith, and Watkins. On July 9, plaintiff claims that defendant Gilles took plaintiff from his cell to the special housing unit ("SHU") without allowing him to bring his medications. (Compl. ¶¶ 118-19). On July 10, plaintiff had a seizure and was brought to the medical unit, where he claims that he was again "suffocated" with the "harmful concoction" by defendant Nesmith, in the presence of defendant Gilles, and assisted by defendant Watkins. (Compl. ¶¶ 125-26).

Plaintiff has never filed any grievance relating to these claims, and he has therefore, failed to exhaust his administrative remedies. (Seguin Decl. ¶ 17 & Ex. A). In any event, as discussed below, plaintiff's allegations regarding this incident have no

---

[21] The complaint refers to this defendant as RN Christy. (Compl. ¶¶ 125-26). However, this nurse's name is Christine Watkins, and the court will refer to RN Watkins using her proper name.

merit.

### 6.    Defendant Murphy (Compl. ¶¶ 111-17) (Claim # 5)

Plaintiff claims that between June 23, 2019 and July 9, 2019, defendant

Disciplinary Hearing Officer George Murphy violated plaintiff's due process rights by

failing to provide a fair disciplinary hearing. Plaintiff was issued a misbehavior report

after the June 17, 2019 incident.[22] (Murphy Decl. Ex. B at 13) (Dkt. No. 63-12). The

misbehavior report, written by defendant Boule, charged plaintiff with violent conduct,

disobeying a direct order, interference with an employee, and refusal of search/frisk.

(*Id.*)

In the complaint, plaintiff alleges that defendant Murphy attempted to coerce him

into pleading guilty prior to beginning the hearing by telling plaintiff that, since he had

filed claims against Murphy's "comrades," he would give him 60 days keeplock and

loss of privileges, and "call it a day," if he pled guilty instead of proceeding with the

hearing. (Compl. ¶ 111). However, if plaintiff fought the charges, Murphy would still

find him guilty, but would sentence him to more than 60 days confinement. (*Id.*)

Plaintiff did not plead guilty, and the hearing was held.

Plaintiff alleges that, after two extensions of the hearing date, defendant Murphy

failed to call all of plaintiff's witnesses, ordered plaintiff to be taken back to his cell,

and conducted the hearing in absentia, without telling plaintiff that his witnesses would

---

[22] This is more support for the court's finding that plaintiff made an error in the date when reporting the incident to OSI for exhaustion purposes. However, even a brief review or investigation into plaintiff's records would have revealed that plaintiff had an "identical" incident which resulted in a misbehavior report and subsequent confinement only one week later than he asserted in his report to OSI.

be called. (Compl. ¶ 116).  Plaintiff claims that he was denied the right to "cross-examine" his own witnesses, and denies that he left the hearing voluntarily. (Compl. ¶ 117).  Finally, plaintiff claims that on July 9, 2019, officers came to his cell to escort him to SHU without giving him defendant Murphy's disposition.

Defendants note that plaintiff never filed a grievance with respect to defendant Murphy's conduct before or during the disciplinary hearing. (Seguin Decl. ¶ 23). DOCCS has a separate review process for the appeal of disciplinary determinations. *Waters v. Jacobsen*, No. 9:18-CV-196 (MAD/ML), 2020 WL 1527054, at *4 (N.D.N.Y. Mar. 31, 2020) (citing See Davis v. Barrett, 576 F.3d 129, 132 (2d Cir. 2009)). Generally, "[a] disciplinary appeal is sufficient to exhaust a claim that an inmate was deprived of due process at a disciplinary hearing." *Id.* (citing *Thomas v. Delaney*, No. 9:17-CV-1023, 2019 WL 4247807, *10 (N.D.N.Y. Aug. 13, 2019) (collecting cases)). However, it has been held that "'allegations of staff misconduct related to the incidents giving rise to the discipline must be grieved.'" *Id.* (quoting *Barker v. Smith*, No. 16-CV-76, 2017 WL 3701495, *3 (S.D.N.Y. Aug. 25, 2017) (quoting *Scott v. Gardner*, 287 F. Supp. 2d 477, 489 (S.D.N.Y. 2003)) (internal quotations omitted).

In this case, the only allegation that could qualify as the type of "staff misconduct" that needed to be separately grieved would be plaintiff's claim that defendant Murphy tried to coerce him into pleading guilty.  All the other claims are alleged due process violations that would be sufficiently exhausted by the appeal of defendant Murphy's disciplinary determination.  Plaintiff appealed the determination through the disciplinary process and, in fact, obtained a reversal of the violent conduct

charge based on lack of evidence.[23] (Murphy Decl. Ex. B at 2).  Plaintiff did not plead

guilty, and the court does not find that plaintiff's initial claim regarding defendant

Murphy's behavior would have to be separately exhausted.[24]  Plaintiff's claim that

defendant Murphy attempted to coerce plaintiff into pleading guilty will be considered

with the merits of plaintiff's due process claim.  Thus, the court will not recommend

dismissal of any of the due process claims against defendant Murphy for failure to

exhaust.

### 7.    Defendants Gerard Caron, Melissa Collins, Donita McIntosh, and Christopher Miller (Compl. ¶¶ 129-34) (Claim # 7)

Plaintiff alleges that the conditions of SHU were unconstitutionally severe, and

that he complained "directly" to defendants Caron,[25] Collins, McIntosh,[26] and Miller[27]

each time that these individuals made their "regular weekly tours" through the SHU.

(Compl. ¶ 132).  Plaintiff claims that he also complained about the pain he was

suffering due to the June 17, 2019 assault and the pain he was suffering due to the

inadequate medical treatment he was receiving. (Compl. ¶ 133).  Plaintiff claims that

---

[23] Defendant Murphy found plaintiff "not guilty" of the interference charge after the disciplinary hearing. (Murphy Decl. Ex. B at 3).

[24] Such a claim is similar to alleging bias on the part of the hearing officer which could be raised on the disciplinary appeal. The claims for which separate exhaustion has been required include filing a misbehavior report in retaliation for plaintiff's exercise of a constitutional right (which would involve the investigation of other conduct by both plaintiff and defendant(s) separate from the disciplinary charges). *See Waters, supra.*

[25] Gerard Caron was Deputy Superintendent of Security at Great Meadow. (Def.s' Statement of Material Facts ("SOF") ¶ 2(d)) (Dkt. No. 63-2).

[26] Donita McIntosh was the First Deputy Superintendent of Great Meadow. (SOF ¶ 2(b)).

[27] Christopher Miller was the Superintendent of Great Meadow. (Def.s' SOF ¶ 2(a)).

these defendants "failed to remedy the daily constitutional violations." (Compl. ¶ 134).

Assistant Director Seguin states that plaintiff has never filed or appealed any grievances to the CORC regarding such unconstitutional conditions, nor has he complained about any of the above defendants in relation to the conditions of the Great Meadow SHU. (Seguin Decl. ¶ 24). Plaintiff has not responded to the summary judgment motion and has not alleged otherwise. There is no indication in the record that plaintiff ever filed such a grievance. Thus, these claims against defendants Caron, Collins, McIntosh, and Miller may be dismissed for failure to exhaust.

## 8.    Defendant Collins (Compl. ¶¶ 149-52) (Claim # 8)

On December 23, 2019, defendant Collins presided over a Tier III disciplinary hearing held after plaintiff received a misbehavior report charging him with refusing a direct order and refusal to provide a urine specimen. (Collins Decl. ¶ 4 & Ex. A) (Dkt. No. 63-11). Defendant Collins states that plaintiff refused to attend the hearing, she held the hearing in absentia, and she ultimately found plaintiff guilty of both charges, sentencing him to 54[28] days of keeplock confinement, together with a loss of privileges. (Collins Decl. ¶¶ 5-7).

Plaintiff was transferred to Five Points Correctional Facility ("Five Points") some time in mid January of 2020.[29] (*See* Seguin Decl. Ex. A) (Plaintiff filed an unrelated

---

[28] The sentence was 60 days, but plaintiff was credited with 6 days prehearing confinement. (Collins Decl. Ex. A at CM/ECF p.6).

[29] In other paragraphs of the complaint, plaintiff states that he was transferred out of Great Meadow on January 16, 2020. (Compl. ¶¶ 139, 142). He states that he was taken to Auburn Correctional Facility, where he stayed for five days, arriving at Five Points on January 21, 2020. (Compl. ¶¶ 143, 144). It is not disputed that plaintiff was at Five Points at the end of January when he filed his grievance there.

grievance at Five Points on January 30, 2020).  Plaintiff never appealed the disciplinary determination by himself, nor did he file a grievance against defendant Collins for any misconduct relative to the hearing.  In his complaint, plaintiff states that he was surprised at Five Points when he was placed in SHU upon arrival, rather than in general population because he believed that his previous SHU confinement[30] expired on January 16, 2020, when he left Great Meadow. (Compl. ¶ 149).  The Five Point staff told plaintiff that his confinement in SHU was due to a "Great Meadow[] disposition." (Compl. ¶ 150).

Plaintiff claims that he did not find out that his SHU confinement was due to defendant Collins's disposition until he received an "incomplete" disposition on January 27, 2020. (Compl. ¶ 151).  Plaintiff claims that he had no appeal available for the disposition, and alleges that defendant Collins unlawfully conducted "hearings"[31] in absentia, depriving plaintiff of due process. (Compl. ¶ 152-54).  Plaintiff alleges that defendant Collins failed to note for the record whether plaintiff's refusal to attend the hearing was knowing and voluntary, resulting in the violation of all his other due process rights, including the ability to call witnesses and to introduce "relevant" evidence. (Compl. ¶ 154).

Read in its most liberal interpretation, and notwithstanding plaintiff's failure to respond to the defendants' summary judgment motion, plaintiff seems to be claiming that he did not find out about the hearing and disposition until after he had transferred

---

[30] Plaintiff is referring to the SHU confinement which he received after the June 17th incident.

[31] Plaintiff believes that defendant Collins held two hearings, one on "1/10/20" and "2/9/20," neither of which is the date that defendant Collins held her one hearing (12/23/19). (Compl. ¶ 153).

to Five Points, and by that time, he had no appeal mechanism for the disciplinary determination, nor could he file a grievance against Collins because his time to file a grievance had passed.  Such an argument relates to whether the administrative remedy was "available" to plaintiff.

A review of the documents submitted by defendants with their summary judgment motion shows that plaintiff refused to accept service of the misbehavior report, refused to attend his hearing, and refused to accept service of the hearing disposition, which informed him of his right to appeal.[32] (Collins Decl. Ex. A at CM/ECF pp. 13, 14, 17, 18, 20).  The plaintiff's December 23, 2019 disciplinary hearing determination was automatically reviewed by the Superintendent because the "confinement sanction [was] more than 30 days."[33] (Collins Decl. Ex. A at CM/ECF p.). The form indicates that the Superintendent reviewed the penalty and made no changes. (*Id.*)

Plaintiff's conclusory allegation that his appeal remedies were not "available" to him because he was transferred and allegedly did not receive defendant Collins's disposition until it was too late to appeal are belied by the many records showing that plaintiff refused to attend hearing or to participate in the process in any way.  He has not responded to the summary judgment motion to challenge the veracity of these

---

[32] Plaintiff's refusal to attend his hearing was witnessed by two corrections officers. (Collins Decl. Ex. A at CM/ECF p.18).  The refusal form informed plaintiff that the hearing would proceed without him if he refused to attend. (*Id.*)  Plaintiff was afforded the opportunity to select an assistant, but waived that right and refused to sign the form. (Collins Decl. Ex. A at CM/ECF p.17).

[33] This document is a "check-box" form, entitled "Superintendent's Review of Disciplinary Disposition Form." (Collins Decl. Ex. A at 1).

documents, which show that he was served with the disposition of the hearing in plenty of time for him to appeal to the Superintendent if he wished, even if he refused to acknowledge receipt.

The fact that the hearing disposition was automatically reviewed does not save the plaintiff from failure to exhaust because the Superintendent would have been unaware of any of the claims that plaintiff would have made if he had opted to participate. In addition, plaintiff failed to bring any grievance against defendant Collins to claim any misconduct separate from the hearing itself. Thus, this court finds that plaintiff failed to exhaust any claims against defendant Collins relative to the December 23, 2019 disciplinary hearing. In any event, as discussed below, the claims against defendant Collins fail on the merits.

IV.    **Medical Care**

A.    **Legal Standards**

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (*citing* inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

## A. Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (*citing Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (*citing Farmer*, 511 U.S. at 844–47).

The second part of the objective test asks whether the inadequacy in the medical care is "sufficiently serious." *Id*. at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (*citing Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (*citing Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)). However, where the alleged inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (*citing Smith*, 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the

condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### B. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Salahuddin* 467 F.3d at 280. (*citing Wilson v. Seiter*, 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (*citing Farmer*, 511 U.S. at 835–37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id*. Deliberate indifference is equivalent to subjective recklessness. *Id.* (*citing Farmer*, 511 U.S. at 839–40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (*citing Chance*, 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (*quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. Thus, the court stated in *Salahuddin*, that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a

30

defendant's mental state may be nonculpable." 467 F.3d at 28.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (*citing Estelle*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

B.    **Analysis**

1.    **Defendant Rocque (Compl. ¶¶ 45-46) (Claim # 1)**

Plaintiff claims that on October 29, 2018, defendant Rocque was deliberately indifferent to his medical needs when she took away his migraine medication upon his admission to Great Meadow. (*Id.*) Defendant Rocque has filed a declaration in support

of the defendants' motion for summary judgment. (Rocque Decl.) (Dkt. No. 63-6).

Defendant is a registered nurse, whose responsibilities include assessing patients,

assisting doctors at the facility, and following doctors' orders regarding patient care.

(Rocque Decl. ¶¶ 1-2).  Defendant states that she would have assessed the plaintiff

upon his arrival at the facility. (Rocque Decl. ¶ 4).

    Defendant Rocque states that, upon any new inmate's arrival, the inmate is

advised that his medications must reviewed by a physician at the facility, who will write

new orders for medications and relay those orders to the nursing staff. (Rocque Decl.

¶ 5).  Any medications that the inmate brings with him into the facility would be given

to a doctor or a physicians' assistant for review. (*Id.*)  As a nurse, defendant Rocque

had no authority to change plaintiff's medications, nor did she have authority to change

the protocol for review of those medications by the appropriate health care professional.

(Rocque Decl. ¶¶ 5, 6).  Plaintiff's Ambulatory Health Record ("AHR") shows that he

was seen by defendant Rocque on November 8, 2018, at which time he was "yelling"

about his medications. (Goe Decl. Ex. A at 194).  Plaintiff "demanded" that his

medications be returned to him immediately and that his eye drops be made "self-

carry." (*Id.*)  Defendant Rocque's notes indicate that the encounter was terminated "by

security." (*Id.*)  Defendant Rocque noted that the chart was given to the doctor for

review. (*Id.*)

    Based on the defendant Rocque's declaration and the medical records

accompanying the defendants' summary judgment motion, there is no indication that

defendant Rocque had any authority to change the medical protocol, and she was

required to give plaintiff's "carry-on" medications to other medical providers for approval.  As such, plaintiff cannot establish that defendant Rocque had a sufficiently culpable state of mind when she took his medications upon his arrival or when she failed to change the protocol for administering those medications on November 8, 2018, and plaintiff's claims may be dismissed as against Nurse Rocque. *See Spencer v. Armor Correctional Health*, No. 18-CV-4638 (JMA/ARL), 2022 WL 992566, at *4 (E.D.N.Y. Mar. 31, 2022) (no culpable state of mind where there is no evidence that the nurse had the authority to prescribe pain medication or override the physician's orders); *Barnes v. Uzu*, No. 20-CV-5885, 2022 WL 784036, at *16-17 (S.D.N.Y. Mar. 15, 2022) (same).

### 2. Defendants Doctors Goe (Compl. ¶¶ 47-50, 54-56, 72, 138), Karandy (Compl. ¶¶ 54-56, 138), and PA Nesmith (Compl. ¶¶ 51, 53) (Claims ## 2(a)-2(e))

Plaintiff claims that on November 1, 2018, he was seen by defendant Goe, who allegedly told plaintiff that he had "to[o] many issues." (Compl. ¶ 48).  Plaintiff claims that defendant Goe lied to him on November 1, 2018 when he promised that he would "at least" order plaintiff's migraine medications "immediately." (Compl. ¶ 49). Plaintiff states that, on November 5, 2018, plaintiff received only Claritin and a nasal spray, but that Dr. Goe failed to order the migraine medications and failed to reinstate the "carry-on" orders. (Compl. ¶ 50).

Plaintiff essentially claims that none of his medical care at Great Meadow was constitutionally adequate.  Dr. Goe has filed an affidavit together with plaintiff's relevant medical records to show that plaintiff received more than constitutionally

adequate medical care while he was housed at Great Meadow. (Goe Decl. & Ex. A).
Plaintiff was seen at various times by both Dr. Goe and Dr. Karandy, who each
addressed various concerns.

Dr. Goe states that he treated plaintiff beginning November 1, 2018. (Goe Decl.
¶ 4). Plaintiff's concerns included "osteoarthritis of the right knee and left shoulder,
migraine headaches, stomach pain, chronic sinus congestion, and cervical neuralgia
(i.e., pinched nerves of the neck)." (*Id.* & Ex. A at 195). Dr. Goe states that he
addressed all of plaintiff's medical problems. However, Dr. Goe states that plaintiff
was not due for a refill of his Imitrex (Migraine medication), and all of plaintiff other
medications were administered by the nurse due to plaintiff's previous suicide attempts.
(Goe Decl. ¶ 6 & Ex. A at 196). Dr. Goe subsequently changed several of plaintiff's
medications to self-carry due to their low risk of harm to plaintiff. (*Id.* & Ex. A at 195).
At various times, and for various reasons, plaintiff's medications were switched from
self-carry to 1:1 administration. (Goe Decl. Ex. A at 10, 20, 123). After plaintiff's
initial arrival and evaluation at Great Meadow, this was done because plaintiff had a
seizure or other episode, occasionally resulting from missing doses of his medications.
(*Id*. at 123) (post seizure).

At plaintiff's November 1, 2018 appointment, Dr. Goe made several referrals to
specialists in order to address the plaintiff's many medical impairments. (Goe Decl. ¶ 7
& Ex. A at 114, 195). These referrals included "additional primary care, physical
therapy, upper endoscopy, and x-rays of the left shoulder and c-spine." (*Id.*) Plaintiff
saw an orthopedic consultant on December 8, 2018, who, inter alia, prescribed physical

therapy. (Goe Decl. Ex. A at 114-15). However, plaintiff refused physical therapy on multiple occasions for both his shoulder and his knee. (Goe Decl. ¶ 8 & Ex. A at 2, 5, 7, 13-16, 18-19, 23, 28). Some of the "no shows" for physical therapy may have been due to the plaintiff's SHU status, but it is clear that he only attended physical therapy sporadically, and occasionally refused to attend.[34] (*See e.g.* Goe Decl. Ex. A at 23). Thus, plaintiff's allegation that Dr. Goe and Dr. Karandy failed to follow up on the specialist's prescription for physical therapy is not supported by the medical records.[35]

Plaintiff had an upper GI endoscopy on November 29, 2018 at the Albany Medical Center, resulting in the discovery of a small hiatal hernia, normal stomach, and normal duodenum. (Goe Decl. Ex. A at 116-22). He was observed post-endoscopy and discharged to his cell by Dr. Goe on November 30, 2018 at 1:30 p.m. (Goe Decl. Ex. A at 132-33).

In January, March, and April of 2019, Dr. Karandy referred plaintiff for ophthalmology consultations. (Goe Decl. Ex. A at 145-65). Plaintiff's visual impairments are treated with medications and contact lenses. There are multiple visits

---

[34] The records indicate that a PT session was completed on June 11, 2019, June 13, 2019 and June 25, 2019. (Goe Decl. Ex. A at 27; Nesmith Decl. Ex. A at 2). However, on 6/27/19, two days later, Dr. Karandy specifically noted that plaintiff "did not come for PTH." (Goe Decl. Ex. A at 25, 27). On 7/9/19, plaintiff "Refused PT session," and a refusal form was completed. (Goe Decl. Ex. A at 23). On 7/16/19, the notes indicate that "PT session not completed No Show SHU inmate - Chart to MD. (Goe Decl. Ex. A at 19). On 7/18/19 AHR note states that "PT session not completed - unable to see due to security issues". (Goe Decl. Ex. A at 19).

[35] In any event, if plaintiff was unable to attend physical therapy due to "security" reasons or due to SHU confinement, that was not the fault of either Dr. Goe or Dr. Karandy, and they cannot be held liable for plaintiff's disciplinary issues.

to eye consultants in plaintiff's medical record.[36] (*Id.*)  On July 1, 2019, Dr. Karandy wrote a detailed report regarding plaintiff's multiple health issues. (Goe Decl. Ex. A at 25).  Dr. Karandy stated that plaintiff was given "unlimited time to have each and every issue addressed." (*Id.*)  "The encounter was not terminated until the patient had no more questions or concerns that he wanted to raise." (*Id.*)

Dr. Karandy noted that, notwithstanding plaintiff's visual impairments, he was seen ambulating through the unit and looking at medical records without difficulty, which did not support his claims of a severe visual impairment.  In any event, his contact lenses were ordered and would be provided to him.  Plaintiff also requested an increase in the dosage for his Excedrin - Migraine, and "a new prescription [was] provided to the pharmacy. (*Id.*)  Plaintiff had also changed his mind about having surgery for the torn meniscus on his right knee, and Dr. Karandy "re-referred" plaintiff to another specialist to address the issue.[37] (*Id.*)  Plaintiff also requested a referral for an epidural to address his cervical impairment.  Dr. Karandy noted that, once the knee issue had been addressed, plaintiff could be referred to "pain management services" to address the spine issues.  Dr. Karandy stated that simultaneous referrals were likely to conflict with each other, and plaintiff was "comfortable" and ambulated easily without impairment. (*Id.*)  Plaintiff was also being treated for sinus congestion and Hepatitis C.  Dr. Karandy noted that plaintiff was halfway through his Hepatitis treatment, and he

---

[36] There are also records discussing plaintiff's eye impairments from a previous facility. (Goe Decl. Ex. A at 166-67).

[37] Plaintiff was seen in February of 2019, but had declined surgery at that time. (Goe Decl. A at 25, 181 (plaintiff offered surgery on 2/25/19, but declined).

was doing well with no side effects or issues. (*Id.*)

In his complaint, plaintiff alleges that Dr. Karandy would send plaintiff to specialists, but would not obey the specialist's orders.  Plaintiff has not responded to the summary judgment motion, and he has failed to specify what orders or prescriptions Dr. Karandy failed to follow.  There is no indication in the medical records that the specialists' orders were not followed by the staff at Great Meadow or by Dr. Karandy specifically.  There are over two hundred pages of plaintiff's relevant medical records.  Occasionally, plaintiff's appointments were terminated due to his hostility toward staff, not because of deliberate indifference to his serious medical needs. (*See* Goe Decl. Ex. A at 194).

Plaintiff's disputes regarding his medications were more the desire to control his own medications and dictate his care than the defendants depriving him of needed medications.  While it is true that plaintiff's medications were taken away from him initially[38] and periodically thereafter, as stated above, the medications were administered by the nurse "1:1."  Dr. Goe articulated the reasons why plaintiff's medications were administered by the staff at various times during his incarceration at Great Meadow.  These instances occurred for evaluation purposes and for purposes of stabilizing plaintiff after a seizure incident to make sure that he was receiving the proper dosage of his medication at the proper time.

---

[38] When plaintiff was transferred to Great Meadow from Downstate, plaintiff's medical records indicate that he had a history of anxiety, depression, and suicide attempts. (Goe Decl. Ex. A at 144, 196).  An AHR entry dated October 30, 2018 states that plaintiff was "in draft" and that there were "6 meds 1:1." (Goe Decl. Ex. A at 196).  These medications were changed to self-carry by defendant Goe on November 16, 2018. (*Id.* at 194).

On April 19, 2019, plaintiff saw Dr. Goe, and was "demanding Neurontin," in addition to "treatment" for his "pinched nerves." (Goe Decl. Ex. A at 178).  Dr. Goe states that no inmate at Great Meadow is allowed to take Flexeril or Neurontin.[39] (Goe Decl. ¶ 12.  Dr. Goe states that the plaintiff's request for Neurontin was sent to, and denied by, the "facility medical director," as indicated by Dr. Goe's April 19, 2019 AHR entry. (Goe Decl. ¶ 12 & Ex. A. at 178).  Although plaintiff claims that Dr. Goe did not renew his "pain medication" on May 17, 2019, the medical records show that Dr. Goe specifically renewed plaintiff's Imitrex. (Goe Decl. ¶ 9 & Ex. A at 32).

On June 17, 2019,[40] there is a note in plaintiff's medical record that he had a "near syncope" in the yard, "security thinks K2," and he "responded well to ammonia inhalant," but was "agitated" in the clinic. (Goe Decl. Ex. A at 125).  At 11:00 a.m., plaintiff ambulated into the unit with security. (Goe Decl. Ex. A at 126).  His gait was steady, but he became abusive and "verbal" with security.  A "use of force" examination was completed, "no injuries noted," "no injuries claimed."[41] (*Id.*)  He appeared lethargic, but followed commands. (*Id.*)

Defendant Nesmith states that he administered the ammonia inhalant on June 17, 2019, in "a successful attempt to have plaintiff regain consciousness. (Nesmith Decl.

---

[39] The court notes that the rule may be facility-specific because plaintiff's medical records indicate that he was receiving both of those medications at Downstate, which may have contributed to his anger at not receiving them while he was incarcerated at Great Meadow. (Goe Decl. Ex. A at 201-204).

[40] This is the same day that plaintiff states that he was assaulted.

[41] As stated above, the use of force was related to plaintiff's attempt to reach for his buttocks during the strip search and defendants' use of force to gain control over him. (Murphy Decl. & Ex. A) (disciplinary records).

¶ 4 & Ex. A).  Defendant Nesmith states that he was not attempting to "suffocate" the plaintiff, and that the ammonia inhalant may have caused the "painful sensations" that plaintiff describes in his complaint. (Nesmith Decl. ¶¶ 5, 8) (citing Compl. ¶¶ 87, 125-26).  Plaintiff was extraordinarily agitated when he "came to," but defendant Nesmith states that he never observed any staff member attempt to suffocate plaintiff or use more force than necessary to prevent plaintiff from hurting himself or others. (Nesmith Decl. ¶¶ 7, 8).

Plaintiff was admitted to the medical unit for monitoring, and by 4:00 p.m. on June 17, 2019, he was alert, and oriented, with no complaints. (Nesmith Decl. Ex. A at 3; Goe Decl. Ex. A at 126).  He told staff[42] that he had a seizure and that he did not "take his meds this morning." (Goe Decl. Ex. A at 126).  Plaintiff was up and walking with a steady gait, his respiration was even, and he was in no acute distress.  By 7:00 p.m., no seizure activity was noted, fluids were encouraged, and he ate his dinner. (*Id.*) He was monitored through the night. (Goe Decl. Ex. A at 126-27).  At 7:00 a.m. on July 18, 2019, plaintiff was alert and oriented, with no seizure activity. (Goe Decl. Ex. A at 127).  However, at 9:00 a.m., he was pounding on the cell door, demanding to speak with OMH.  A mental health referral was made, and by noon, he was sitting on the bed speaking with a mental health provider. (*Id.*)  The notes state that plaintiff would not specify his mental health complaints. (*Id.*)  Plaintiff was discharged at 12:40 p.m. (*Id.*)

On July 10, 2019, plaintiff was found lying face-down outside his cell. (Nesmith

---

[42] The signature on the document is illegible.  However, the same signature appears on the mental health referral form, and it appears to be the signature of an RN, who is not a defendant herein. (Goe Decl. Ex. A at 128).

Decl. ¶ 6 & Ex. A).  He was given nasal Narcan twice by a nurse at the cell, but then brought to the clinic where defendant Nesmith again administered the ammonia inhalant, to which plaintiff responded.[43] (*Id.*)  He was very agitated upon regaining consciousness and was again admitted for observation. (*Id.*)  Plaintiff told Dr. Goe that he missed two doses of one of his medications that morning. (Goe Decl. Ex. A at 123-24).  Plaintiff's medications were changed from "self-carry" to "1:1" so that the dosages could be regulated and plaintiff's condition stabilized. (Goe Decl. Ex. A at 123). Plaintiff was discharged on July 12, 2019, when he no longer had neurologic symptoms and was "medically stable." (Goe Decl. Ex. A at 123).

Defendants have established that there is no question of fact regarding plaintiff's medical care.  Plaintiff has failed to oppose any of the facts set forth in the medial records or in any of the defendants' declarations.  It is clear from the plaintiff's records that he did not believe that the defendants were caring for him properly, but often refused the care that was offered to him.  To the extent that he wished to have a different medication prescribed, defendant Goe states that plaintiff was not allowed by the facility medical director to have the medications that he wanted. (Goe Decl. ¶ 12 & Ex. A at 178).  On two occasions, defendant Nesmith administered an ammonia inhalant to bring plaintiff back to consciousness, and concedes that the substance could cause burning or discomfort as the plaintiff suggests, but there is no indication that defendant Nesmith was attempting to suffocate the plaintiff during either incident. Thus, plaintiff's medical care claims may be dismissed as against all the defendants.

---

[43] Defendant Nesmith states that he did not try to suffocate plaintiff "at any time." (Nesmith Decl. ¶ 8).

### V.    Due Process

#### A.    Legal Standards

To begin a due process analysis relating to prison disciplinary proceedings, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

The due process protections afforded inmates facing disciplinary hearings that are found to affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing inter alia, *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id*. (citing inter alia, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)). If the court determines that the plaintiff received due process, it need not reach the issue

of whether plaintiff had a liberty interest under *Sandin*. *Bedoya v. Coughlin*, 91 F.3d 349, 352 (2d Cir. 1996).

### B.    Analysis

#### 1.    Defendant Murphy (Compl. ¶¶ 111-17) (Claim # 5)

Plaintiff alleges that on June 23, 2019, he was brought to a disciplinary hearing, conducted by defendant Murphy. (Compl. ¶ 111).  Plaintiff makes various allegations against defendant Murphy, including the attempt to "coerce" plaintiff to plead guilty prior to the start of the hearing, the failure to call witness and allow plaintiff to "cross-examine" them, and failure to note for the record that the time for completing the hearing had been extended. (Compl. ¶¶ 111-17).

Defendant Murphy has submitted a declaration, together with the disciplinary records, including a copy of the misbehavior report, a transcript of the disciplinary hearing, a copy of the Commissioner's review of the Superintendent's Hearing, and other relevant disciplinary records from the hearing. (Murphy Decl. & Exs. A, B).  The misbehavior report was written by defendant Boule regarding the June 17, 2019 incident. (Murphy Decl. Ex. B at 13).  The report states that defendant Boule was conducting a probable cause frisk for apparent drug use.  Plaintiff was directed to remove his white boxer shorts and pass them "back."  At that time, plaintiff reached for his buttocks, and force became necessary to gain compliance. (*Id.*)

Although the documents indicate that plaintiff was served with the misbehavior report on June 18, 2019, when the hearing began on June 22, plaintiff maintained that he never received a copy of the report, even though the other officer present in the

hearing room recalled serving plaintiff with the report.[44]  Plaintiff also completed an employee assistance form. (*Id.*)  Defendant Murphy adjourned the hearing so that plaintiff could have an opportunity to read the report and obtain any evidence that he wished for the hearing. (Murphy Decl. Ex. A, Hearing Transcript ("HT") at 1-2).

The hearing was reconvened on July 1, 2019. (HT at 3).  Plaintiff was unhappy with the assistance that he received, even though he obtained both of the documents that were requested on his form. (HT at 3).  Plaintiff told defendant Murphy that he had also requested medical information, video evidence, and witnesses, including the officers present and a mental health representative. (HT at 3-5).  Defendant Murphy explained that the video evidence would not be available due to a malfunctioning of the equipment. (HT at 5).  Defendant Murphy agreed that obtaining mental health evidence would be appropriate, and adjourned the hearing in order to obtain MHU testimony. (HT at 5-6).

The hearing was later reconvened.  However, defendant Murphy stated for the record that plaintiff had demanded to be removed from the hearing room and taken back to his cell. (HT at 6).  Defendant Murphy also stated that plaintiff was informed that the hearing would continue in his absence.  Defendant Murphy then read the misbehavior report into the record and began taking testimony. (HT at 6).  Defendant Murphy heard testimony from defendant Gilles, who stated that he was present during the incident and confirmed the accuracy of the misbehavior report. (HT at 6-7). Defendant Murphy specifically asked whether defendant Gilles believed that plaintiff

---

[44] For some reason, plaintiff also objected to the officer's presence in the room. (Murphy Decl. HT at 1-2).

reaching for his buttocks was intentional or whether it was related to his drug use. (HT at 7). Defendant Gilles testified that he believed that it could have been "both." (*Id.*)

Defendant Murphy then heard testimony from defendant Boule, who stated that he did not believe that plaintiff's conduct in reaching for his buttocks was a "spasm" caused by a medical condition. (HT at 8). Defendant Murphy adjourned the hearing after defendant Boule's testimony and reconvened the hearing on July 2, 2019.[45] (HT at 8). At that time, Corrections Officer Freson testified that he had gone to plaintiff's cell in order to bring him to the hearing, but the plaintiff refused to attend. (*Id.*) Officer Freson testified that he explained to plaintiff that the hearing would continue even if he did not attend. (*Id.*)

Defendant Murphy then heard the testimony of Dr. Karandy. (HT at 8-10). Defendant Murphy read the misbehavior report to Dr. Karandy, who testified that plaintiff did have a history of seizures. (HT at 9). Dr. Karandy also testified that plaintiff's behavior on June 17th was consistent an inmate who ingested drugs or with an inmate who was having a seizure. (*Id.*) However, Dr. Karandy testified that the act of reaching for his buttocks, such as described in the misbehavior report, would not have been consistent with an individual having a seizure. (HT at 10).

The hearing transcript indicates that defendant Murphy adjourned the hearing to obtain "confidential MHU testimony." (HT at 10). The actual testimony is not part of the hearing transcript. After the MHU testimony, defendant Murphy issued his determination, finding plaintiff guilty of all charges except interference with an

---

[45] The hearing was adjourned due to the lateness of the hour. (HT at 8).

employee. (HT at 10). Defendant Murphy sentenced plaintiff to 15 days prehearing confinement with 99 more days of SHU and 120 days of loss of packages, commissary, and telephone. (*Id.*) Defendant Murphy stated his bases for the determination, including the testimony of the officers described above and the confidential MHU testimony. Defendant Murphy found that plaintiff's intellectual competence was not an issue. He also found as an "aggravating factor" that this was plaintiff's second failure to obey a direct order violation since April 29, 2019. (*Id.*) Defendant Murphy also put the appeal information on the record, but noted that the plaintiff was not present to sign the documents, having chosen to forgo the hearing. (HT at 10-11).

Plaintiff appealed the decision, and on September 19, 2019, D. Venetozzi, the Director of Special Housing/Inmate Disciplinary program dismissed the violent conduct charge (104.11), finding that the misbehavior report did not support the charge. (Murphy Decl. Ex. B at 1-2). Plaintiff's records were adjusted accordingly.[46] (*Id.*)

Plaintiff's first claim that defendant Murphy tried to coerce him to plead guilty prior to the hearing is not supported by the record. In any event, plaintiff did not plead guilty, and he was given ample opportunity to review the misbehavior report and ask to have witnesses and evidence produced. The hearing was adjourned immediately when plaintiff claimed that he had not received the misbehavior report, even over the officer's

---

[46] Although Director Venetozzi's form states that the penalty was not changed, even though one of the charges was dismissed, it is unclear whether that is the case. The total confinement portion of defendant Murphy's sentence, including prehearing confinement is 114 days, while the total confinement portion on Director Venetozzi's form is 90 days. This discrepancy does not affect this court's decision because it is questionable with either confinement that plaintiff had a liberty interest, and because this court finds that, even assuming a liberty interest was created, plaintiff was afforded all the process that he was due.

statement that he had served it on the plaintiff.  Defendant Murphy obtained plaintiff's witnesses even after he chose to leave the hearing and failed to return for its completion.  The fact that the video was unavailable does not change this court's finding.  In any event, the unavailability of the video due to mechanical malfunction of the camera is not the hearing officer's responsibility.  Defendant Murphy obtained medical and mental health testimony in an effort to investigate plaintiff's defense that his medical or mental state influenced his actions on June 17, 2019.

Plaintiff claims that he was unable to cross-examine witnesses.  First, the due process rights afforded by *Wolff* do not include the right to "cross"-examination. *Wiley v. Kirkpatrick*, 801 F.3d 51, 64 (2d Cir. 2015) (citing *Wolff*, 418 U.S. at 567). *See also Fava v. Bryant*, 9:20-CV-156 (TJM/TWD), 2022 WL 356739, at *8 (N.D.N.Y. Feb. 7, 2022) (no right under *Wolff* to confrontation or cross-examination at prison disciplinary hearings).  Plaintiff's voluntary absence from the hearing prevented him from even questioning the witnesses.[47]  However, that is not a due process violation by defendant Murphy.  In his complaint, plaintiff claims that he never refused to attend the hearing. (Compl. ¶ 117).  While plaintiff also refused to sign the forms indicating that he refused to attend the hearing, the rest of the evidence does not support his allegations.  As

---

[47] Although there is no right to full cross-examination or confrontation, inmates do have the limited right to question witnesses. *Lebron v. Mrzyglod*, No. 14-CV-10290 (KMK), 2019 WL 3239850, at *17 (S.D.N.Y. July 18, 2019) (citations omitted). Plaintiff waived his right to do so by his voluntary absence from the hearing. *Woodward v. Ali*, No. 9:13-CV-1304 (LEK/DJS), 2018 WL 4190139, at *13 (N.D.N.Y. Aug. 10, 2018) (citing inter alia *Boddie v. Connecticut*, 401 U.S. 371, 377-78 (1971)), *report-recommendation adopted*, 2018 WL 4188430 (N.D.N.Y. Aug. 31, 2018)). "'[I]t is well established federal precedent that an inmate's refusal to attend a disciplinary hearing waives his due process objections where it occurs through no fault of prison authorities.'" *Id.* (quoting *Hinton v. Prack*, 9:12-CV-1844 (LEK/RFT), 2014 WL 4627120, at *15 (N.D.N.Y. Sept. 11, 2014) (citations omitted)).

stated above, the officer who went to get plaintiff from his cell, and who is not a defendant in this action, specifically stated on the record that plaintiff refused to attend.

There was "some" evidence to find plaintiff guilty of the violations. This is true even if one of the charges was ultimately reversed because the constitutional standard for sufficiency of evidence is "some," or "a modicum" of evidence, while the standard under state law is "substantial evidence." *Heyliger v. Iffert*, No. No. 9:18-CV- 1113 (LEK/CFH), 2020 WL 8254418, at *10 (N.D.N.Y. Dec. 14, 2020), *report-recommendation adopted sub nom. Heyliger v. Peacock*, 2021 WL 212821 (N.D.N.Y. Jan. 21, 2021). Thus, any due process claims may be dismissed as against defendant Murphy.

### 2.    Defendant Collins (Compl. ¶¶ 149-52)

Plaintiff claims that defendant Collins violated his due process right by presiding over a "secret" hearing. (Compl. ¶¶ 149-52). As stated above, plaintiff was charged on with refusing a direct order and a urinalysis violation. Plaintiff alleges that he only found out about the hearing after he was transferred to Five Points, and therefore, he was found guilty of misbehavior that he did not know he committed, and he was denied all the due process protections. However, the hearing packet submitted as an exhibit to the Collins declaration shows that on December 18, 2019, Officer Laduke served the misbehavior report on plaintiff at 8:52 a.m. (Collins Decl. Ex. A at 3, 11, 13, 19). The misbehavior report charges plaintiff with refusing to submit a urine sample. (Collins Decl. Ex. A at 12) (106.10 - direct order; 180.14 - urinalysis testing). According to the misbehavior report, plaintiff refused to provide a sample because he "just did this last

month." (*Id.*)

The hearing was scheduled to take place on December 23, 2019. However, plaintiff refused to attend. (Collins Decl. ¶¶ 5, 6). His refusal was witnessed by two officers. (Collins Decl. Ex. A at 15). Defendant Collins found plaintiff guilty of the charges, and sentenced him to 6 days of prehearing confinement and 54 days of keeplock, together with a loss of 54 days of packages and commissary. (Collins Decl. Ex. A at 3). Plaintiff refused to sign for a copy of the disposition and refused to sign any documents that were associated with the disciplinary hearing. (Collins Decl. Ex. A at 10, 11, 14 (assistant form), 15 (refusal to attend hearing)). The Superintendent reviewed the disposition and affirmed the result. (Collins Decl. Ex. A at 1).

While the Second Circuit has avoided a bright line rule that a certain period of SHU confinement automatically fails to create a liberty interest, it has established certain "guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed." *Chavez v. Gutwein*, No. 20-CV-342 (KMK), 2021 WL 4248917, at *7 (S.D.N.Y. Sept. 17, 2021) (citations omitted). For periods of restricted confinement of under 100 days, generally no liberty interest will be implicated unless the conditions of confinement are atypical and significant. *Id.* For periods of confinement of 101 to 305 days, a detailed record must be developed comparing the inmate's condition to ordinary prison conditions. *Id.*

In this case, plaintiff was sentenced by defendant Collins to a total of 60 days in "keeplock" confinement, which is confinement to an inmate's own cell. Plaintiff has not shown that his conditions of confinement for that time were sufficiently atypical

and significant to establish a liberty interest.[48]  The plaintiff's due process claims

against defendant Collins may be dismissed on that basis alone.

However, even if the court were to assume that plaintiff had a liberty interest,

there are no facts that would support any due process violation by defendant Collins.

Plaintiff's refusal to attend his hearing waives any challenges to the conduct of that

hearing. *Hinton v. Prack, supra.*  Defendant Collins had no choice but to rely upon the

misbehavior report that was written on December 17, 2019, stating that plaintiff refused

to provide a urine sample.  Plaintiff's claim that defendant Collins presided over a

"secret" hearing is meritless, and the due process claims against her may be dismissed.

## VI.    Excessive Force/Sexual Assault (Compl. ¶¶ 85-113) (Defendants Gilles, Boule, Rich, Papa, John & Jane Does (Claim # 4)

### A.    Legal Standards

To establish an excessive force claim, the plaintiff must satisfy both an objective

test and a subjective test. *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992).  Objectively, a

the plaintiff must establish that the force applied was "sufficiently serious" or harmful

to establish a constitutional violation. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)

(quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)) (additional citations omitted); *see

also Romano v. Howarth*, 998 F.2d 101, 104 (2d Cir.1993). The objective component is

"contextual and responsive to 'contemporary standards of decency.'" *Hudson*, 503 U.S.

at 9.  In addition, a plaintiff "need not prove 'significant injury to make out an

---

[48] Defendant Collins states that through July of 2019, she walked through many parts of Great Meadow, including the SHU. (Collins Decl. ¶ 8).  Defendant Collins states that, when she visited the SHU during this time, she did not notice that it was smokier or hotter than any other part of the facility. (*Id.*)

excessive force claim,'" *Griffin v. Crippen*, 193 F.3d 89, 92 (2d Cir.1999), but "a de minimis use of force will rarely suffice to state a constitutional claim." *Romano*, 998 F.2d at 105.

Sexual abuse "by a corrections officer can give rise to an Eighth Amendment claim," *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015) (citing *Boddie v. Schnieder*, 105 F.3d 857, 859 (2d Cir. 1997)) ("*Crawford I*"), and violates the Constitution when the alleged conduct "serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate," *id.* (emphasis added.)  Even a "single incident of sexual abuse, if sufficiently severe or serious, may violate" an inmate's rights. *Id.* The critical inquiry "is whether the contact is incidental to legitimate official duties, such as a justifiable pat-frisk or strip search, or by contrast whether it was taken to arouse or gratify the officer or humiliate the inmate," *Crawford*, 796 F.3d at 257 (citing *Whitley v. Albers*, 475 U.S. 312 (1986)).

**B.    Analysis**

Defendants argue that plaintiff has failed to establish either a physical or sexual assault which violated plaintiff's eighth amendment rights.  Defendants argue, inter alia, that plaintiff was unable to identify which, among multiple defendants, violated his constitutional rights, and they are therefore, entitled to summary judgment. (Def.s' Mem. of Law at 18-20) (Dkt. No. 63-1) (citing *Piper v. City of Elmira*, 12 F. Supp. 3d 577, 591 (W.D.N.Y. 2014)).  Plaintiff's complaint to OSI in March 2020–almost one year after the incident–stated that a sexual assault was committed by defendant Gilles and six unknown officers, and when he signed his federal complaint, on April 14, 2020,

he named defendants Gilles, Boule, Rich, Papa, and three unknown officers, who allegedly assaulted him physically first and then sexually during the same incident. (Compl. ¶¶ 85-113).  However, by the time that plaintiff was deposed on August 24, 2021, he named defendant Gilles and Boule as his assailants together with other officers, of whose names he had to be reminded. (Pl.'s Dep. at 21-26, 28-30, 87-93).[49] Plaintiff only definitely identified defendant Gilles and testified that he did not know the identities of the other officers "until [he] read the report." (*Id.*)

In *Piper*, the court held that "[a] plaintiff may establish an officer's personal involvement through facts suggesting that the officer was either personally involved in the use of force or was present during the use of force and failed to intervene." 12 F. Supp. 3d at 596 (citation omitted).  Further, "[i]n adducing such facts, the "'plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene.'" *Id.* (quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003), *aff'd*, 426 F.3d 549 (2d Cir.2005)).  "'[T]he mere fact that [an] [o]fficer was present for the entire incident does not, on its own, establish that he had either awareness of excessive force being used or an opportunity to prevent it.'" *Id.* (quoting *Rodriguez v. City of New York*, No. 10 Civ. 9570 (PKC/KNF), 2012 WL 1658303, *5 (S.D.N.Y. 2012)).

In this case, plaintiff has named four officers, and has alleged that defendant Gilles ordered the others to "fuck him up" prior to the physical assault taking place. (Compl. ¶ 98).  Plaintiff has also claimed that Gilles was the officer who ran his hand

---

[49] Defendants have filed only excerpts of plaintiff's deposition, and the court has cited to the pages of the deposition as they are numbered at the top of the page, not to the CM/ECF pagination.

up and down his buttocks. (Compl. ¶ 100). Thus, the cases cited by defendants do not support their argument in this case because plaintiff has identified individuals who were present during the incident and who may have participated in the alleged assault or may have failed to intervene in an assault that was taking place.[50]

While plaintiff was unable at his deposition to state exactly what the other officers did or did not do in failing to intervene, it is undisputed even from the defendants' own records that a use of force took place when plaintiff allegedly reached for his buttocks. Plaintiff claims that the defendants took "mocking photographs" of his buttocks and anus in addition to other humiliating conduct. However, plaintiff claims that they failed to take pictures of the injuries that they inflicted as a result of the excessive force. The details of how the defendants brought plaintiff "into compliance" are not stated in any of the documents, and the records indicate that a "use of force" examination was conducted after the incident, but the details of that examination are also not stated. While plaintiff has not responded to the summary judgment motion, and this court makes absolutely no finding on the merits of this claim, I find that there is at least a question of fact regarding the alleged physical/sexual assault which precludes granting summary judgment in favor of defendants Gilles, Boule, Rich, and Papa as to the June 17, 2019 incident.[51]

---

[50] The plaintiff makes it clear in the complaint and in his deposition that defendant Nesmith, although involved in placing the ammonia inhalant near his mouth and nose, was not present either for the alleged physical or sexual assault because the uses of force occurred after plaintiff was taken out of the infirmary and was taken to the observation cell. (Pl.'s Dep. at 34-35).

[51] As part of their argument that plaintiff cannot identify the defendants involved in the assaults, they argue that, at plaintiff's deposition, he stated that defendants Morley and Caron were also "involved" in the assault. Defendant Morley, who as stated above is the Acting Deputy Commissioner/

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 63) be **DENIED** as to defendants Gilles, Boule, Rich, and Papa **only as to the June 17, 2019 incident alleging physical/sexual assault (Compl. ¶¶ 94-113)**, and it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 63) be **GRANTED AND THE COMPLAINT BE DISMISSED IN ALL OTHER RESPECTS AS TO ALL OTHER DEFENDANTS**, either for failure to exhaust or on the merits as discussed above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:  May 12, 2022

Andrew T. Baxter
U.S. Magistrate Judge

---

Chief Medical Officer of the DOCCS Division of Health Services, and it is highly unlikely that he was involved in any incident involving plaintiff, particularly in the June 17th alleged assault.  Plaintiff's passing reference to him at his deposition is not sufficient to add him to the complaint as a defendant in this incident, and it is clear that plaintiff was having a difficult time making specific identifications. Defendant Caron is the Deputy Superintendent of Great Meadow, and plaintiff never alleged that he was involved in the assault.  Thus, the court does not consider these stray comments by plaintiff at his deposition to be an amendment of his claims.  In any event, if the case should go to trial on this issue, his deposition testimony may be used on cross-examination.